JOHN HOWLAND, SAMUEL MEEKER, JOHN CHADWICK, AND OLIVER S. HALSTEAD, JUN., CLAIMANTS OF THE BARQUE GRIFFIN, HER TACKLE, &c., APPELLANTS, *v.* JOHN GREENWAY AND GEORGE S. DICKSON, LIBELLANTS.

The regulations at the port of Rio Janeiro require the master of a foreign vessel, upon her arrival at the port, to deliver to the proper officer, upon his visit to the vessel, his passport, manifest, and list of passengers.   He is also required, at the end of the manifest, to make such declarations or statement for his security, by adding any packages that may be omitted or exceeded in the manifest, giving his reason for such omissions; no excuse will afterwards be admitted for any omissions or error.

The regulations further declare that, when it is proved that the vessel brought more goods than are specified or contained in the manifest, and not declared by the master, such goods will be seized and divided among the seizors, the master also paying into the national treasury a fine of one-half their value, besides the customary duties thereon.

*Howland et al. v. Greenway et al.*

Where the master of a vessel omitted to enter a part of the cargo upon his manifest, and in consequence thereof the boxes were seized and confiscated, the vessel and her owners were responsible to the consignees upon a libel filed in the District Court of New York, where the contract of affreightment was made.

A delivery into the custom-house under the order of the officers, and the payment of duties by the consignees, did not discharge the contract of the owners. The delivery contemplated by the contract was a transfer of the property into the power and possession of the consignees.

The evidence upon the amount of damages is not such as to justify this court in reversing the decree of the court below.

THIS was an appeal from the Circuit Court of the United States for the southern district of New York.

It was a libel filed in the District Court, sitting in admiralty, against the barque Griffin and her owners, by Greenway and Dickson, on a contract of affreightment. The circumstances are stated in the opinion of the court.

The District Court passed the following decree: .

This cause having been heard on the exceptions to the commissioner's report, and argued by the advocate for the respective parties—

On reading the report of George F. Betts, Esq., United States commissioner, to whom the above matters were referred, by which there is reported due the libellant, on the bill of lading referred to in the libel, the sum of sixty-nine hundred and eleven dollars and fifty-two cents, on motion of Messrs. Weeks & De Forrest, proctors for the libellants, it is ordered that the report be in all things confirmed, and that the libellants recover in this action against the barque Griffin, her tackle, &c., the amount reported due, with interest thereon from the date of the report, together with their costs to be taxed, and that the said barque, her tackle, &c., be condemned therefor. And on like motion it is further ordered, that out of the proceeds of the stipulations of the claimants for cost and value, when paid into the registry of this court, the clerk of this court pay to the libellants or their proctor the amount reported due, together with their taxed costs. And on like motion of Messrs. Weeks & De Forrest, proctors for the libellants, it is further ordered, that unless an appeal be taken to

this decree, with the time limited and prescribed by the rules and practice of this court, that on payment into the registry of the court of the amount of the stipulations for costs and value, that the clerk distribute the proceeds in satisfaction of this decree.

This decree was affirmed by the Circuit Court, and the owners of the barque appealed to this court.

It was argued by *Mr. Halstead* for the appellants, and by *Mr. Gifford* for the appellees, upon which side there was also a brief filed by *Mr. De Forrest*.

The bill of lading stated that the boxes were to be delivered at the ship's tackles to Greenway & Co., at Rio de Janeiro, or their assigns. Abranches was in Rio, a partner in a commercial house there, who purchased the goods. Being examined as a witness, he said that he knows that the said one hundred and thirty-two boxes did form part of the "Griffin's" cargo, as he, witness, saw them when discharged from the vessel into the custom-house; that said boxes contained furniture, and were addressed to his house, and each package bearing the mark of the firm, M. O. Abranches & Co., and the counter-mark G. & Co., and were also numbered.

The counsel for the appellants insisted that the testimony shows that the omission of the boxes in the open manifest was observed by Greenway & Co., in time to supply the omission, and avoid all difficulty; and (so far as it may have any bearing upon a view of the whole case) that the same is true in reference to Abranches & Co. The consignees failed to notify the master of the omission. It could then have been supplied by the master, and all difficulty avoided. The supplying it then would be the same in effect as if it had been supplied by the master before delivering the manifests to the custom-house officers. On this open manifest the master could then have supplied the omission. It was on this only that he could have ever before supplied it. The other was sealed. The omission by the consignees, after discovering the error in time to have it corrected, to notify the master of it, was a gross failure of duty as consignees, and is proof of intended fraud.

The boxes were sold by order of the custom-house.

We are nowhere told when and how the omission first came to the knowledge of the custom-house, nor when the goods were seized, nor when they were sold.

They were purchased by Abranches & Co. We are nowhere told how they were sold, whether all in a lump at one bidding, or how; and are nowhere told the amount of Abranches's bid on which they were struck off to him.

The end was, that the consignees refused to pay the master any freight at all collected by them, on any of the cargo; and besides that, have brought this libel to the whole value of the one hundred and thirty-two boxes.

What could more strongly give the character of fraud to the omission of the consignees to notify the master of the omission at the time when it could have been supplied by him?

One other fact in this connection. The consignment to Greenway & Co. was changed.

As to the value of the goods at Rio, the only evidence is, the answer of Magalhaen, the shipping clerk, and the answer of Abranches.

There was a regular invoice of the goods sent to Greenway & Co.; that invoice contained a list of the goods and invoice price.

We submit that this testimony of the value was insufficient. It was, in the nature of things, impossible for us to give any proof whatever of the value. The chairs and furniture were enclosed in boxes; how many boxes contained chairs, and what kind of chairs; and how many contained tables, and what kind; and how many other furniture, and what kind, it was impossible for us to show. The boxes contained 2,613 cubic feet, freight fifteen cents per foot. A space eighteen feet square by eight feet high would contain 2,592 cubic feet, within twenty-one feet of the cubic feet in these boxes. How could chairs and furniture, that could be in these boxes, be worth $5,000 or $6,000? There is no evidence that the chairs and furniture contained in the boxes were worth that. Abranches says the boxes were seized, &c. But in his answer to

the fifteenth interrogatory he says the contents of the boxes were purchased, &c.; and in his answer to the sixteenth interrogatory he says the value of the contents of the cases (boxes) was, &c. And Magalhaen, in his said answer to interrogatory sixteen, "value of the contents of the boxes." The invoice, spoken of by this witness, in his said answer, and by Edward T. Davison, in his deposition, and by Abranches, was not put in evidence.

As to damages. This libel is in a cause of contract; and the libel prays damages for the non-delivery of the goods, near end of libel. The actual damage to the libellants is the meas ure of damages to be awarded.

If they had bought the boxes at the sale, and then delivered them to Abranches, the only damage they would have sustained would be the amount they bid them off at, and that amount reduced by the amount of freight on the boxes, for they paid no frieght on them.

But they were struck off to Abranches. This fact proves that there was an understanding between them. It is not supposable that Greenway & Co. would permit Abranches to get the boxes at what they might be struck off for at such a kind of sale, and hold them without paying Greenway & Co. the cost of the goods, (if they were bought in New York with the money of Greenway & Co.,) less the amount paid by Abranches at the sale by the custom-house. So that, in either of those cases, the damage to Greenway & Co. would be the amount given to get the goods from the custom-house by buying them at such a sale. Hence, the care taken not to let it appear what the boxes were bought for at the sale.

If the chairs and furniture were bought in New York with the money of the Abranches, the effect would be that Greenway & Co. would lose nothing but commissions.

If the libellants have presented their case in such a way that they cannot recover on the only proper ground on which a recovery can be had, and if they have not given to the court the means of ascertaining what should be recovered on that proper ground, they cannot recover anything.

By the 155th article it is provided, that when it is found

that the vessel brought more goods than is specified or con tained in the manifest, and not declared by the captain, such goods will be seized and divided among the seizors, &c. How did it happen that the boxes were not opened by the seizors, to see what was to be divided among them; and that the boxes and contents were sold, without opening the boxes, and sold all to one man, and, as we have a right to say from the testimony, sold at one bidding? It is proof of the fraud, be- fore stated, at the beginning, and of collusion between the consignees and the custom-house officers, and (if it were necessary to say so) proof that Abranches was a party to the collusion.

The court, we trust, will not permit these consignees to make a speculation out of a case such as the testimony shows this to be, and where no fraud could have been intended, the boxes and every article of cargo being actually delivered into the custom-house.

Again, the charge in the libel, that the said boxes or goods were confiscated by the Brazilian Government to its use, is wholly unsustained. There is no evidence that they were subject to such confiscation, and if they were so subject, there is no proper evidence of any act of confiscation by the said Government.

The laws of the port of Rio do not authorize the seizure of goods after they have been discharged into the custom-house for omission of entry in the manifest.

The goods were bought by Leland & Davison, of New York, for account of Abranches & Co., and were marked to Abranches & Co., and the duties were to be paid by Abranches & Co., as is shown by their actually paying a portion of the duties, and they got the goods by paying what they were struck off to them for. That amount, less the freight and duties, (for he says, in the answer to the same interrogatory, that the duties which had been paid were afterwards returned, and it is clear that no freight was paid,) would be all the damage they could have suffered.

In this view, we submit that Abranches & Co. were the persons to bring an action, and not Greenway & Co.

The counsel for the appellees made his points partly dependent upon the law, and partly upon the facts, as they are taken from the brief of *Mr. De Forrest.*

I. The ship was bound by the bill of lading to deliver the goods to the consignees.

The general rule is, that the delivery must be to the consignee in person; and this rule is always applicable, unless some other mode of delivery is sanctioned by the usage of trade or express contract.

Angell on Carriers, secs. 297, 298.

1 Parsons Mar. Law, p. 153.

3 Comstock, 325, Price *v.* Powell, et cases cited.

17 Wendell, 305, Gibson *v.* Culver.

II. In the case of sea-going vessels, the usages of most ports make a delivery on the wharf, with reasonable notice to the consignee, a sufficient delivery. If the consignee cannot be found, or declines to receive the property, the carrier is not justified in leaving it on the wharf, even after notice. It is his duty in such a case to place it in a proper and safe place, where the consignee can obtain it.

15 Johnson, 42, Ostrander *v.* Brown.

1 Denio, 45, Fisk *v.* Newton.

Angell on Carriers, sec. 300.

1 Pars. Mar. Law, p. 155, note.

III. In the present case, the goods were never delivered to the consignees.

1. It does not appear that Greenway & Co. ever received notice from the master that the goods were being discharged, or that they were ever invited to receive them. On the contrary, the testimony shows that the goods were landed on the custom-house wharf, and deposited in the custom-house, and were there seized before any attempt was made by the master to make delivery, and while they were still in the custody of the officers.

2. It does not appear that Greenway & Co. had any information from any quarter that the goods were being discharged. The first notice given to them was that of the seizure.

3. The partial payment of the duties was made by A branches

& Co., who had agreed with Greenway & Co. to pay the invoice cost, with freight, commissions, and duties, and under the expectation that no obstacle was in the way of the delivery of the goods.

This prepayment, in anticipation of an expected delivery, was certainly no waiver of the right to demand it, and in any event the acts of Abranches cannot prejudice the rights of Greenway & Co.

4. The proceedings taken by the master to obtain the release of the goods made it very manifest that he did not at that time think of charging Greenway & Co. with the consequences of his neglect, or of claiming that the delivery had been consummated.

5. Finally, the witnesses all concur in asserting that the goods were never delivered to Greenway & Co. The onus of showing the contrary is on the ship.

IV. The clause in the bill of lading, stating that the goods were "to be delivered at the ship's tackles," does not vary the obligation of the carrier to make such a delivery as shall give to the consignee the actual possession of the property.

1. The object of this clause is to indemnify the vessel against possible expenses incurred beyond the ship's side, and before actual delivery to the consignee—*e. g.*, lighterage, expenses of permits to discharge, wharfage, &c.

2. A deposit on the wharf, alongside the ship, certainly would not be a good delivery, without notice.

The clause in question cannot control the explicit contract to deliver to the consignees.

V. The non-delivery of the goods not having been occasioned by the expected perils, the ship and owners are clearly liable for their value.

1. Even if the seizure had been the arbitrary and merely capricious act of the Brazilian Government, the failure to deliver would not have been excused.

1 Campbell, 451, Gosling *v.* Higgins.

10 Q. B. R., 517, Spencer *v.* Chadwick.

10 Ad. and Ell., N. S., S. C.

4 Mann and G., 954, Evans *v.* Hatton.

2. But the seizure was directly occasioned by the culpable neglect and omission of the master.  He first omitted to make up a correct manifest at the port of starting; and though having all the leisure of a long voyage to review his papers, and full opportunity on his arrival at Rio to make known the omissions, he neglects to do so, and thus insures the seizure and confiscation.

VI. Even if the goods had come into the possession of Greenway & Co., the ship would not have discharged herself. Her duty was to deliver possession clear of all claims and liens incurred by the fault of her master and owners.  Anything short of this would not have been the delivery contracted for under the bill of lading.

VII. The commissioner did not err in his computation of the damages.

The value of the property at Rio was sworn by Abranches to be $6,000, and the invoice value at New York was stated by Magalhaen to be between $5,000 and $6,000, which, with the addition of freight, &c., harmonizes the testimony.

The claimants had the opportunity of cross-examining Mr. Davison, who purchased the goods in New York, but they deliberately refrained from doing so.

VIII. This court will not on this hearing consider any exception as to the admissibility of any of the depositions or exhibits.

IX. The decree of the Circuit Court should be affirmed, with costs.

Mr. Justice CAMPBELL delivered the opinion of the court.

This was a libel, in the District Court of the United States for the southern district of New York, against the barque Griffin and her owners, on a contract of affreightment by the appellees.   The libel stated, that in November, 1852, at New York, there was shipped on that barque, of which the appellants are owners, one hundred and thirty-two boxes of chairs and furniture, to be delivered at the ship's tackles at the port of Rio de Janeiro, to the appellees, according to the terms of a bill of lading.  That the regulations of the port of Rio de

Janeiro require the owner or master of a vessel arriving there, to submit to the officers of the customs a manifest of the cargo on board; and that cargo not mentioned in the manifest cannot be passed through the custom-house, but is liable to seizure and confiscation for that omission.

That the master of the barque omitted to enter the said consignment on the manifest rendered by him on his arrival, and in consequence the boxes were seized and confiscated, and so were lost to the consignees. The libellees answer that the goods referred to in the libel were discharged in accordance to the bill of lading, under the laws and regulations of the port, and under the order of the proper Government officers, and went into the custom-house under the direction of the libellants, they paying the duties thereon.

That after the delivery at the ship's tackles of the said shipment, the consignees became responsible for their safety; and that they were not confiscated or forfeited to the Government, nor abandoned by the consignees to the owners of the ship. Upon the pleadings and proofs, a decree was rendered against the libellees in the District Court, which was affirmed in the Circuit Court, on appeal.

It appears from the testimony that it is the duty of a master of a foreign vessel, upon her arrival at the port of Rio de Janeiro, to deliver to the proper officer, (Guarda Mor,) upon his visit to the vessel, his passport, manifest, and list of passengers. He is required, "at the end of the manifest," to make such "declarations or statement for his security by adding any packages that may be omitted or exceeded in his manifest, giving his reason for such omissions; no excuse will afterwards be admitted for any omissions or error."

That, "when it is proved that the vessel brought more goods than are specified or contained in the manifest, and not declared by the master, such goods will be seized, and divided among the seizors, the master also paying into the national treasury a fine of one-half their value, besides the customary duties thereon." It further appears, that the Griffin reached the port of Rio de Janeiro in January, 1853, and that her master rendered her passport, manifest, and list of passengers,

and was required to make any statement or declaration in addition, and informed that no other opportunity would be afforded to him. The master answered, that he had no addition to make or declaration to record. The goods were discharged according to the custom of the port, under the direction and orders of the revenue officers, into the custom-house, and while there, and before the entry had been completed, they were seized and confiscated under the regulation before stated. In a petition by the master to the Brazilian Government for a remission of the forfeiture and penalty he had incurred, he says: "That on the last voyage of the vessel a seizure was made of one hundred and thirty-two packages of furniture, more or less, on the ground that they were not entered in the manifest, and, although the petitioner acknowledges that the custom-house officers have acted according to the instructions of the department, still there are reasons of equity which render this seizure contrary to law."

These reasons were, that the Brazilian consul at New York was a novice in his office, and had failed to give him accurate information, and had approved of a manifest full of mistakes; and that the master had acted in good faith, and was obviously free from any suspicion of a design to defraud the revenue. This petition was referred to the director general of the revenue, who returned for answer: "That taking into consideration the quantity of the packages seized, (130 cases,) and the quality of the goods therein contained, (furniture,) and more particularly the circumstances which occurred before the seizure thereof, (the packages having been landed, and the duties paid,) there is no plausible reason to ascribe to fraud or bad faith the omissions of the said packages in the manifest of the vessel in which they were imported; but, on the other hand, the circumstance of the proof of fraud, or even of its presumption, is not essential in order to render the seizure a legal one in the present hypothesis. It is expressed in the case before mentioned, in the articles 155, 156, of the general regulations of the 22d June, 1836, that the simple fact of finding either more or less packages is punishable with the penalties therein decreed; and the seizure to which the petition

refers having been made and adjudged in conformity with the provisions of the said article 155, I am of opinion that the decision of the custom-house ought to be confirmed." The decree was entered accordingly. The testimony shows that the packages were sold by the inspector of the customs as forfeited, and that the consignees sustained a total loss. There is no testimony to show that they contributed to produce this result. It was the duty of the master of the barque to acquaint himself with the laws of the country with which he was trading, and to conform his conduct to those laws. He cannot defend himself under asserted ignorance, or erroneous information on the subject. It is the habit of every nation to construe and apply their revenue and navigation laws with exactness, and without much consideration for the hardship of individual cases. The magnitude and variety of the interests depending upon their efficient administration compel to this, and every ship-master engaged in a foreign trade must take notice of them.

The Vixen, 1 Dod., 145; the Adams, Edwards, 310. In the case before us, the master was informed of his duties upon his arrival at the port of destination by the officers of the customs, and his embarrassment and loss can be attributed to nothing but his inattention. The question arises, whether the appellants are responsible for the miscarriage of their master and agent. Their contract is an absolute one to deliver the cargo safely, the perils of the sea only excepted. Under such a contract, nothing will excuse them for a non-performance, except they have been prevented by some one of those perils, the act of the libellants, or the law of their country. No exception of a private nature, which is not contained in the contract itself, can be engrafted upon it by implication as an excuse for its non-performance. Atkinson *v.* Ritchie, 10 East., 533. In Spencer *v.* Chadwick, 10 Q. B. R., 516, the defendants pleaded, "that the ship, in the course of her voyage to London, called at Cadiz; and while there, the goods were lawfully taken out of the ship by the officers of the customs on a charge of being contraband under the laws of Spain, without default on the part of the officers of the ship. The

court affirm the rule, that when a party, by his own contract, creates a duty or charge upon himself, he is bound to make it good, if he may, notwithstanding any accident by inevitable necessity, because he might have provided against it by his contract." It was for the libellees to furnish the evidence to discharge themselves for the failure to perform their contract.

They insist that the delivery of the cargo into the custom-house under the order of the officers, and the payment of duties by the consignees, was a right delivery, and that the consignees are responsible for their safety afterward. We do not concur in this opinion. The delivery contemplated by the contract was a transfer of the property into the power and possession of the consignees. The surrender of possession by the master must be attended with no fact to impair the title or affect the peaceful enjoyment of the property. The failure to enter the property on the manifest was a cause of confiscation from the event, and rendered nugatory every effort subsequently to discharge the liability of the ship and owners.

The appellants complain that the proof does not support the decree in respect of the damage assessed. One witness testifies to the market value of the packages in Rio de Janeiro, and another approximates their cost in New York, and upon this testimony the assessment was made. It was competent to the appellants to introduce testimony in the Circuit Court, or in this court, upon that subject, but none has been submitted.

We should not be justified in concluding the decree to be erroneous under the circumstances.

Decree affirmed.