70 U.S. 225
 18 L.Ed. 194
 3 Wall. 225
 THE CONVOY'S WHEAT.
 December Term, 1865
 
 WOLCOT, as agent of certain persons, shipped on board the schooner Convoy, at Chicago, several thousand bushels of wheat. The master executed a bill of lading for it, which ran thus:
 'Shipped in good order, &c., &c., to be delivered unto con signee, as per margin. Freight and charges to be paid as noted below, upon the actual and complete delivery of the said goods and freight to said consignee, or their assigns.'
 On the margin below was entered:
 'Acct. Carrington & Preston, Oswego, N. Y., via Welland Railway from Port Colbourne to Port Dalhousie, thence by sail or steam to Oswego. Freight to Port Colbourne, 8 1/2 cents per bushel.'
 The reader will understand, of course, that the wheat was to be carried by the Convoy from Chicago, by the lakes, to Port Colbourne, at the eastern extremity of Lake Erie; that there it was to be unladed, and carried by the Welland Railway across the Canadian isthmus to Port Dalhousie, on
 Lake Ontario; there to be re-shipped on a second vessel, and carried along Lake Ontario to Oswego, on the eastern Part of the lake. The Convoy was too large a vessel to pass through the Welland Canal.
 Parol testimony from Wolcot, the agent of the shippers, went to show, specifically, that the contract made by the master of the Convoy had been to carry the wheat to Port Colbourne only; and that he, Wolcot, had made a separate contract with the Welland Railway Company 'to take it from there through to Oswego.' The vessel agent at Chicago, one Goodenow, who filled the blanks in the Convoy's bills of lading and made the entries on the margin, testified to a similar effect; he swearing, moreover, that the expression, 'via Welland Railway,' entered on the margin, was construed by him as having the same meaning as 'care of the Welland Railway.'
 The Convoy having arrived at Port Colbourne on the 29th of August, 1860, the master reported her to the Welland Railway Company, and informed the agents having charge of the railway and the elevator there that he was ready to discharge his cargo. There were then thirteen vessels in the port with cargoes to discharge, which had arrived before the Convoy; and the agents replied that they would discharge the Convoy's cargo in its turn. The master made a similar application on the morning of the 30th of August, and received answer as on the morning previous. There being no elevator but the one at Port Colbourne, and no warehouse or place where the wheat could be stored, the Convoy left Port Colbourne on the 30th of August, and went to the city of Buffalo, the nearest port to Port Colbourne. On the 31st of August she discharged her cargo in that city, and the master stored it at the Hatch elevator there, taking a receipt for its delivery to his order. On the next day, which was Sunday, he sailed for Chicago; and the owner of the Convoy telegraphed thus from Buffalo to Carrington & Preston, the consignees at Oswego:
 'Obliged to store cargo Convoy in the Hatch elevator, in this city; shall libel cargo for freight and demurrage at Port Colbourne, and freights and charges here, unless settled immediately.'
 This telegram was the first and only information sent to the consignees relative to the cargo. There was a telegraphic communication between Port Colbourne and Oswego.
 Carrington & Preston, feeling themselves aggrieved by proceedings which they regarded as somewhat summary, declined to settle the account so immediately as invited; and the ship-owner libelled the wheat in the District Court for the Northern District of New York, for freight and damages, in the nature of demurrage.
 It appeared that if the Convoy had remained at Port Colbourne she would have been unladed on the 4th of September, in her regular order; that the railway company did everything in their power to despatch business, and discharged cargoes as fast as the capacity of their elevator and road would permit; and that, at this time, an unusual number of vessels had arrived, and that there was an unusual amount of grain to be handled on the road and at the elevator.
 The District Court dismissed the libel. The Circuit Court affirmed its decree. Appeal here.
 Mr. Hibbard, for the appellants, owners of the Convoy: By the entries on the margin of the bill of lading, taken in connection with Goodenow's explanation of the word via, with the circumstances of the case, and especially the size of the vessel, which could not pass through the Welland Canal, it appears that the contract was to carry to Port Colbourne, and that there the ship owner should be entitled to receive freight. The freight was to be paid when the vessel's delivery was 'actual and complete' at Port Colbourne.
 The ship-owner did all he could to perform his contract. It was the duty of the owner of the cargo to provide means at the port of delivery for unlading the cargo. The owner of the cargo not providing these means, the ship-owner was right in delivering his cargo at the nearest practical commercial point, which was Buffalo. He was not bound to wait for days, to his great detriment, and look to the possibility of recovering his damages of the shipper, or ultimate consignee, while that owner or consignee was continually guilty of breaking his contract by not providing means for unlading the vessel.
 In Clendaniel v. Tuckerman,* a New York case, it was held that it is the duty of a consignee to receive; that he must do this within a reasonable time; that his duty and responsibility in this respect is the same, after a reasonable time has elapsed, as in the case where lay days and demurrage are stipulated for in the bill of lading, and that after that reasonable time has elapsed the ship-owner may store the cargo elsewhere and recover his freight and damages.
 Our conduct here was quite according to this case, which holds, further, that it is the duty of the carrier, under such circumstances, to store the goods in some place of safety, retaining his lien for his freight, &c.
 Suppose it had appeared that the property could have been delivered at another dock? Would not the ship-owner have had a right to deliver there and to claim freight? Beyond question. The different ports around the Western lakes are really, in principle, other docks, as to Western produce seeking its market on the seaboard.
 Nor was it necessary that the master should have telegraphed to Oswego. There is no proof of any custom to do so. The carrier's business was to perform his contract according to law. He did so perform it here. He was not bound to address the owners of the cargo, for the purpose of ascertaining whether they would make a new contract. Why require notice to a man whose business it was to be at the port, and there absolve himself from his responsibilities to receive the cargo? Besides, the case shows, in effect, that nothing could be done with the property at Port Colbourne. There was but one elevator there, and that was full. The law will not require a futile notice. The doctrine in relation to notice only applies where the owner or consignee is at the port, and can in some way take possession of the property.
 To say that the master knew about the place, and should have provided against delay by special contract, begs the question. The shipper also knew about the place. It was his duty to see that the property was received, and if he desired to qualify that duty, he should have provided for it in the contract.
 Mr. Ganson, contra, for the consignees.
 Mr. Justice MILLER delivered the opinion of the court.
 
 
 1
 It is not necessary to determine whether the libellant in this case, who was owner of the ship, contracted to deliver the wheat to the consignees at Oswego, or whether he contracted to deliver it at Port Colbourne. The bill of lading given by the master of the vessel, shows that it was understood that from Chicago to Port Colbourne was only part of the voyage which the wheat was to make, and that from Port Colbourne it was to be forwarded by the Welland Railway on its further voyage.
 
 
 2
 The testimony is clear, that at Port Colbourne there is an elevator belonging to that railroad company, and that it is the only one; and that there is no other warehouse or receptacle in which the wheat could be stored. The course of the trade demands that wheat shipped to Port Colbourne must go through that elevator, and if the vessels making delivery are so numerous that it cannot relieve them promptly, they must await their turn. The master of the vessle must be held to have made his contract with a full knowledge of this course of trade, and be governed by it. He had, therefore, no right, when he found there would be a delay of several days in delivering his cargo at the elevator, to carry it to Buffalo at the expense of the owner.
 
 
 3
 There is another matter in which the master failed in his duty. There was a telegraphic line in operation between Port Colbourne and Oswego, where the consignees resided, and he could, at any time during the three days he lay at Port Colbourne, have notified them of his difficulty, and received their instructions. He did nothing of the kind; but, after waiting about half the time that would have been required to enable him to discharge his cargo, he sailed to Buffalo, deposited the wheat there, subject to his own order, and then notified consignees by telegraph that he should libel it for freight and damage, unless paid immediately.
 
 
 4
 DECREE AFFIRMED, WITH COSTS.
 
 
 
 *
 17 Barbour's Supreme Court, 184.