## THE MILL BOY.

*(District Court, E. D. Arkansas. July, 1882.)*

1. SHIPPING—CARRIER BY WATER—RIVERS OF THE SOUTH-WEST.

   The rules regulating the liability of a carrier of goods by water to landings where there are wharves and warehouses, and where the consignee resides or may be found, are not applicable to neighborhood or way landings on the river banks of the south-west, where there is no wharf and no warehouse, and where the consignee does not reside, and is not to be found.

2. SAME—USAGE AND CUSTOM.

   The usage and custom has been uniform that when the boat put goods off at such a landing in good order and condition, and the person living at or near the landing was notified of the fact, and requested to look after them and notify the consignees, the liability of the boat was at an end, and, being reasonable, contracts of affreightment will be presumed to have been made with reference to such usage and custom.

3. SAME—DUTY AND OBLIGATIONS OF CONSIGNEES—LOCAL USAGE AND CUSTOM.

   Where the consignees had notice in fact of the precise character of the landing, and ordered a mill consigned to such landing, and lived at a distance from it, with no direct or speedy means of communication between the landing and themselves, it was their duty to have been in attendance to receive the mill, or to have had an agent at or near the landing for that purpose, if they did not desire to be bound by delivery in accordance with the usage and custom of the landing.

*M. W. Benjamin,* for libelants.

*G. B. Dennison,* for claimant.

CALDWELL, D. J. On the eighth of September, 1881, the libelants directed their correspondents at Little Rock to ship to them by boat, "to Cates' landing, on the Arkansas river," a Bradford pully gristmill, consisting of 30-inch stones, stand, and hopper. On the twenty-seventh of September the mill was shipped on the defendant boat, consigned as directed. There is no wharf or warehouse at Cates' landing, and no means of storing or protecting goods put out there. In low water boats cannot reach the high banks in consequence of a prominent sand bar, extending from the main land far out into the river channel, and at such time it is conceded the "landing" is on this sand bar, which is so broad that teams have to be

employed to convey goods to the main land. But this carriage of goods over the bar is always done by the consignee and never by the boat. The boat put the mill off in good order and condition, and at the place all goods for that landing are discharged and received by the consignee, when the river is at the stage it then was. The libelants resided some 20 miles from the landing, and there was no means of direct or speedy communication between the landing and the place where they reside. They owned a steam saw-mill, situated about two miles from the landing, where the mill in question was designed for use, and it was shipped by boat to this landing on account of its proximity to the place where it was to be run. One Lyon was at libelants saw-mill running and managing the same, and was commonly reputed to be the agent of the libelants in matters pertaining to such mill, though one of the libelants testifies that he was not their agent for any purpose. The officers of the boat, in conformity to usage, notified a citizen who resided on the bank of the river at the landing that the mill had been put off, and requested him to notify libelants, or their agent, of the fact; and the freight bill was left with him, as was usual with all boats leaving goods at that landing. He notified Lyon, who said he would come·for the mill as soon as he could get a team to haul it, and he made unsuccessful efforts to get a team for that purpose. He also sent word to libelants the first opportunity he had of doing so, which was four or five days after the mill was landed. Lyon failed to come and get the mill, and the day after libelants were personally notified of its arrival, and before they had had time to make the necessary arrangements to remove it, a sudden rise in the river carried the mill off and it was lost. The mill remained a week where the boat left it before the rise came which washed it away. On this state of facts is the boat liable for the loss of the mill?

The general rule is that the carrier by water may deliver goods on the wharf, but to constitute a valid delivery there, the master should give due and reasonable notice to the consignee, so as to afford him a fair opportunity to remove the goods, or put them under proper care and custody.

The learned proctor for the libelants insists this general rule governs this case, and that, though the mill was deposited at the proper landing, the boat was not discharged from liability, because the libelants were not notified.

I am inclined to think the testimony supports the conclusion that Lyon was the agent of the libelants to receive notice that the mill

was deposited at the landing; and notice having been given to him in apt time, the boat was discharged from liability under the rule contended for. But if I am mistaken in supposing Lyon was libelants' agent, the same result is reached on other grounds. The rules regulating the liability of a carrier of goods by water to landings where there are wharfs and warehouses, and where the consignee resides or may be found, are not applicable to a case like this.

The question in this case is, when is the carrier discharged from liability, when the contract is to carry to a neighborhood or way landing where there is no wharf and no warehouse, and where the consignee does not reside and is not to be found?

Such landings are not uncommon on the rivers of the south-west. They are established or rather named by the settlers living in the vicinity for their own convenience, and to avoid the labor, expense, and delay of traveling to some established wharf or landing where the usual facilities for storing goods may be found. It is a well-known fact that on the Arkansas and other rivers in the south-west the distance between towns or established ports where there are warehouses, or wharf-boats, is often very great. The necessities and convenience of the settlers imperatively require that their goods should be delivered on the bank of the river, as near their plantations and homes as practicable, regardless of wharfs or warehouses. The practical sense and generous spirit of good neighborship which characterized these settlers very soon devised means for accomplishing the desired ends. It was perceived at once that the rules governing the rights and duties of carriers by water, where the contract is to carry to some established port having a wharf or warehouse, and where the consignee resided or might be found, or where he could be speedily notified by telegraph or otherwise, could have no application to these country or way landings. It was seen that a boat could not be required to lay at each one of these landings until the consignees appeared to receive their goods, or until notice of their arrival could be sent to them. To impose such an obligation on a boat would protract her voyage unreasonably and indefinitely; and no boat would receive goods consigned to a way landing, if such an obligation had to be incurred. Accordingly, some spot deemed most favorable for a boat landing would be fixed upon by the settlers and given a name. Some settler living at or near the landing, for the accommodation of his neighbors, would take it upon himself to notify them, by some of those casual methods usual among people in the country, when goods were put off at the landing for them, and would assume such

care and oversight over the goods in the mean time as good neighborship and the necessities of the case seemed to require. And the usage and custom has been uniform that, when the boat put goods off at such a landing in good order and condition, and the person living at or near the landing, was notified of the fact and requested to look after them, and notify the consignee, the liability of the boat was at an end. This usage and custom is strikingly analogous to the rule governing the liability of carriers where goods are consigned to ports having the usual storage facilities.

In *Fick* v. *Newton*, 1 Denio, 45, the court says:

" Where goods are safely conveyed to the place of destination, and the consignee is dead, absent, or refuses to receive, or is not known, and cannot, after due efforts are made, be found, the carrier may discharge himself from further responsibility by placing the goods in store with some responsible third person in that business at the place of delivery, for and on account of the owner. When so delivered the store-house keeper becomes the bailee and agent of the owner in respect to such goods."

And the person in whose charge, in a very general sense, the goods may be said to be left at these landings, and who is expected to notify the consignee, is, as between the carrier and consignee, to be regarded as the bailee or agent of the latter, and not of the former, although no such relation may exist in fact between him and the consignee, or certainly none other than that of a bailee without reward. The usage and custom relating to the delivery of goods at these landings is shown to have prevailed, and to have been generally known and uniformly acted upon, ever since boats have navigated the Arkansas river, now more than half a century. It is a reasonable usage, and contracts of affreightment will be presumed to have been made with reference to it. Persons consigning goods to such landings must, therefore, be held to know their character, and the usage and custom relating to the delivery of freight thereat.

The libelants had notice in fact of the precise character of Cates' landing; and having ordered the mill consigned to this landing, and living at a distance from it, with no direct or speedy means of communication between the landing and themselves, it was their duty to have been in attendance to receive the mill, or to have had an agent at or near the landing for that purpose, if they did not desire to be bound by the delivery in accordance with the usage and custom of the landing. The boat earned her freight. The libel will be dismissed, and a decree entered against the libelants in favor of the owner and claimants of the boat for the freight and all costs.