## THE PORT ADELAIDE.

### MONTGOMERY *v.* THE PORT ADELAIDE.

*(District Court, S. D. New York. May 24, 1889.)*

1. SHIPPING—CARRIAGE OF GOODS—PLACE OF DELIVERY—CUSTOM.
   A vessel is required to make delivery of cargo within such parts of the port as have become fixed by established usage, if a customary berth can be obtained there within a reasonable time. If the vessel go elsewhere, she must make good the additional expense thereby caused to the consignee.

2. SAME.
   A vessel arrived December 26, 1888, with a cargo of tea to be delivered to numerous consignees at the "port of New York." It had long been the custom to deliver teas on the New York side between piers 16 and 47, East river. The vessel might have obtained a berth at pier 47 on the 27th. For her convenience, and on promise of indemnity by warehousemen in Brooklyn, she discharged her cargo in Brooklyn against the protest of many consignees. *Held*, that the latter should recover their extra expenses of cartage, ferriage, etc., from Brooklyn to New York.

In Admiralty. Libel for damages.
*Norwood & Coggeshall* and *R. D. Benedict*, for libelant.
*Owen, Gray & Sturges*, for claimants.

BROWN, J. On the night of December 26, 1888, the steamer Port Adelaide, from Shanghai, arrived at this port with a cargo consisting almost wholly of tea. About 6,000 packages—one-tenth of the cargo—were consigned to the libelant. Early on the 27th she proceeded to Roberts' stores, Brooklyn, where she began to discharge on the morning of the 29th. The libelant and various other consignees, on learning that the vessel had gone, or was going, to Brooklyn to discharge, notified the ship's agents of their objection to receiving the cargo there, and claimed that by the custom of the port it was deliverable on the New York shore,

within the two tea districts from pier 16 to pier 47, East river. The vessel was entered at the custom house on the 27th, and a general order and permit to discharge were obtained on the 29th. This suit was brought to recover the additional expense of $77, caused to the libelant for cartage, ferriage, etc., through the discharge of his part of the cargo at Brooklyn, instead of within one of the New York districts. Several similar claims of other consignees are understood to abide the result of this suit, which was instituted in order to test the right to discharge such cargoes in Brooklyn under the existing usages of this port.

In the case of *Devato* v. *Barrels of Plumbago*, 20 Fed. Rep. 510, this court had under consideration the rights and duties of ship and cargo in regard to the place of delivery, as between New York and Brooklyn, where the bill of lading provided, as in this case, for a delivery at the "port of New York." It was there said, pages 516, 517:

"The limits of the port, as respects a delivery under the bill of lading, turn purely upon the question of fact within what limits ships and merchants have been accustomed to receive and deliver cargoes consigned here, without regard to geographical divisions. * * * Consignees of goods have a right to expect a delivery according to the established custom and usage of the port, and in that part of the port customarily used for the discharge of such goods; and the vessel is bound, and has a right, to make delivery accordingly. * * * The question in any particular case must be whether the practice of landing at such parts of the port has become so general and so established as to be fairly and reasonably entitled to be recognized as within those limits wherein the merchants of the port ordinarily receive, and vessels ordinarily discharge, such goods. To show this, proof of usage is necessarily received, and such is its appropriate office."

See, also, *Steam-Ship Co.* v. *Dempsey,* L. R. 1 C. P. Div. 654. In that case it was held that, Brooklyn being within the geographical limits of the port of New York, a delivery there at Pierrepont's stores, where for many years similar cargoes had been customarily delivered, was a right delivery under the bill of lading, notwithstanding the consignee's objection. In the present case the proof is clear that until very recently cargoes consisting principally of teas, like that of the Port Adelaide, consigned to the port of New York, have been accustomed to be discharged only on the New York side of the East river. The three or four instances of a delivery of similar cargoes in Brooklyn within the last six months have arisen largely through the efforts of warehousemen in Brooklyn to procure the delivery of the cargoes there for storage, and upon arrangements made by them for indemnifying the vessel for her disregard of the long-established custom. A similar agreement of indemnity was given in this case,—a circumstance that recognizes both the fixity of the usage to deliver in New York, and the obligation of the ship to observe it. These few instances of recent discharge in Brooklyn, and under such provisions, wholly fail to show any such change of usage as to warrant delivery there, except on consent of the owners of the cargo.

It was contended that the Port Adelaide could not obtain a berth within the usual tea districts in New York immediately upon her arrival; and that the facilities for delivering on the south side of pier 47,

where a place was in fact provided for her in the afternoon of the 28th December, were insufficient; and that the vessel was also in need of certain repairs, which made berthing in Brooklyn more desirable. These circumstances do not justify the Adelaide in departing from the established usage so far as to throw upon the consignees the burden of the extra expense thereby caused. Within reasonable limits, the ship must take the risk of delay in obtaining a berth where by custom the contract requires her to make delivery. In case of apprehended delay, if her own interest, or needful repair, makes it desirable to her to discharge elsewhere within the port, I do not say that she may not do so; but it can be only upon paying the extra expense which the departure from the usage inflicts upon the consignees. It is the same as respects facilities for a rapid discharge. No doubt the improvements and greater space at many of the new Brooklyn docks are of great advantage to the ship; but until the establishment of a new custom, or the consent of the consignees to a change from the former customary place of discharge, the ship is not entitled to avail herself of these superior advantages without compensation to the cargo-owners for the injuries the change imposes on them. In the present case I cannot find that there was any serious endeavor to procure a berth for the Port Adelaide within the accustomed districts on the New York side. On the morning of the 26th a clerk of the ship's agents made inquiries at the proper office in the lower district, and was informed that no berth in that district would be open until the 7th of January. Proceeding to the office in the upper district, and not finding the officer in, no further inquiry there was made; but arrangements were immediately effected for berthing her at Brooklyn, under an agreement with the warehousemen for indemnity, as above stated. All this was before the ship had arrived in the upper bay. On the morning of the 27th, as soon as the consignees were informed of the ship's arrival and intention to go to Brooklyn, arrangements were made by some of them, upon application in the upper New York district, for a berth on the lower side of pier 47, which was in fact vacated and made ready for the ship by 4 o'clock P. M. of that day. Previous notice thereof was given to the ship's agents early on the 27th. Had the latter made any reasonable endeavors to procure a berth in New York, they could not have failed to have procured the same berth through the officer in charge, who promised this berth as soon as applied to. Such cargoes had long been accustomed to be discharged there, whether the opposite side of the pier was in use for discharging or not. As the vessel was not ready to commence unloading until the 29th she would not have been subjected to any delay had she gone there in the afternoon of the 27th, as she might have done. The libelant is therefore entitled to the extra expense caused him by the ship's not discharging within the limits allowed by the established usage; and the ship must look to her indemnitors for reimbursement.