## TAN HI et al. v. UNITED STATES.
### No. 24662.

United States District Court
N. D. California, S. D.

Nov. 29, 1950.

Lyman Henry, Kent A. Sawyer and Hall, Henry & Oliver, all of San Francisco, Cal., for libelants.

Frank J. Hennessy, U. S. Atty., Keith R. Ferguson, Sp. Asst. to Atty. Gen., and C. Elmer Collett, Asst. U. S. Atty., all of San Francisco, Cal., John T. Casey, Attorney Department of Justice, Washington, D. C., of counsel, for respondent United States of America.

GOODMAN, District Judge.

The ultimate question presented by this libel for cargo loss is whether a carrier's delivery of cargo into the custody of customs authorities as required by the law of a foreign port of destination constitutes the "proper delivery" required of the carrier by the Harter Act, 27 Stat. 445, 46 U.S.C.A. §§ 190–196.

The cause was submitted to the Court upon stipulated facts. They are substantially as follows: Early in 1946, libelants, residents of Manila, P. I., ordered certain merchandise shipped to them from San Francisco and Los Angeles aboard the SS President Grant, a vessel owned and operated by the United States. At this time the port of Manila had not recovered from the effects of World War II. Overtaxed berthing facilities necessitated the imposition of berth priorities for perishable cargoes and caused delays in discharging cargo having no priority, such as that consigned to libelants. The piers were inadequate to properly handle the great number of shipments arriving, or to house them in safety once they were discharged from the vessels. Theft, looting and pilferage were notorious on the piers and beyond the power of the local authorities to fully control or prevent. All the piers at Manila were owned by the Philippine Government. The arrestre service, consisting primarily in the receipt, storing, and delivery of cargo, was carried on by the Manila Terminal Company, Inc., a private corporation acting as agent for the Philippine Customs under contract with the Government. By Philippine law, carriers were required to discharge all cargo unladen at Manila into the custody of the Manila Terminal Company. Both libelants and respondent were aware of these circumstances affecting the safety of cargo discharged at Manila. Respondent included in the bills of lading clauses designed to relieve it of responsibility for cargo once it had been surrendered into the custody of the customs or other governmental authorities.[1] On March 23, 1946, the SS President Grant berthed at Pier 7 at Manila. At that time the tele-

---

[1] Clause 1. "* * * The Carrier shall not be liable in any capacity whatsoever for any delay, non-delivery or misdelivery, or loss of or damage to the goods occurring while the goods are not in the actual custody of the Carrier * * *"

Clause 5. "The Carrier, Master and ship shall have liberty to comply with any orders or directions as to loading, departure, arrival, routes, ports of call, stoppages, discharge, destination, delivery or otherwise howsoever given by the government of any nation or department thereof or any person acting or purporting to act with the authority of such government or of any department thereof, or by any committee or person having, under the terms of the war risk insurance on the ship, the right to give such orders or directions. Delivery or other disposition of the goods in accordance with such orders or directions shall be a fulfillment of the contract voyage. * * *"

"In addition to all other liberties herein the Carrier shall have the right to withhold delivery of, reship to, deposit or discharge the goods at any place whatsoever, surrender or dispose of the goods in accordance with any direction, condition or agreement imposed upon or ex-

phone and mail service at Manila was in such unreliable condition that no personal notice to consignees of the arrival of the vessel was feasible. Notice of arrival was published in Manila newspapers, the best available means of communication. On succeeding days, the cargo consigned to libelants was discharged into the custody of the Manila Terminal Company. While in the custody of the Terminal Company a portion of the cargo disappeared and has never been delivered to libelants. The libel seeks recovery of its value.

■ Libelants first urge that respondent should bear the loss because respondent was negligent in discharging the cargo at the Port of Manila when respondent was aware that it had to be discharged into the custody of the Manila Terminal Company who was unable to handle it properly. The short and realistic answer is that libelants were well aware of the risks inherent in discharging cargo at Manila at the time the shipment was ordered. The factual record does not sustain libelants' claim that the parties contemplated that the cargo would be unloaded elsewhere than at Manila if conditions had not improved by the time the President Grant arrived. The looting on the piers was not a fleeting occurrence. It had continued for more than a year and there was nothing to indicate that it would cease in the near future. The large number of shipments arriving at Manila is convincing evidence that others did not feel the inadequate facilities warranted avoidance of the port. Libelants have not shown that it would have been feasible or wise to have diverted the cargo to another port for transshipment overland to Manila. In view of the widespread disorder in the Manila area it is likely that the cargo would have thereby been subjected to even greater risks. The fact is that libelants ordered the merchandise shipped knowing full well of all the risks, and respondent did all that it could to deliver safely.

Libelants' second theory of liability is that their merchandise was not "properly" delivered as required by the Harter Act of 1893 [2] and hence that respondent must bear the loss, even though respondent did all in the way of delivery that the laws of the Philippines permitted.

■ The Harter Act does not define the requisites of a "proper delivery." But the intent with which the term was used is disclosed by the Act's historical background. The Harter Act was an outgrowth of a growing practice by carriers to insert clauses in their bills of lading unduly limiting their obligations to shippers. New and more stringent conditions were added to meet each court decision holding a vessel for a previously non-excepted liability, until the common-law responsibility of carriers by water had been nearly frittered away. The shippers were not in an economic position to bargain for more equitable contracts of affreightment. Nor were they even able, in the press of business, to adequately apprise themselves of the conditions under which their merchandise was shipped, so complex had the bills of lading become. The Harter Act was designed to re-determine the relations between shipper and carrier and to prohibit contracts restricting the carriers' common-law obligations—one of which was to make a good or proper delivery. The Willdomino, 3 Cir., 1924, 300 F. 5; The Delaware, 1896, 161 U.S. 459, 16 S.Ct. 516, 40 L.Ed. 771.

■ The duty imposed by the common-law upon water carriers was merely to transport from port to port, or from wharf

acted from the carrier by any government or department thereof or any person purporting to act with the authority of either of them. In any of the above circumstances the goods shall be solely at their risk and expense and all expenses and charges so incurred shall be payable by the owner or consignee thereof and shall be a lien on the goods."
Clause 12. " * * * The responsibility of the Carrier in any capacity shall

altogether cease and the goods shall be considered to be delivered and at their own risk and expense in every respect when taken into the custody of customs or other authorities. * * * "
2. Sections 1 and 2 of the Harter Act, 27 Stat. 445, 46 U.S.C.A. §§ 190–196, impose upon carriers a duty to "properly deliver," which cannot be avoided by agreement with shippers or by delegation to others.

to wharf. The carrier was not bound to deliver at the warehouse of the consignee; it was the duty of the consignee to receive the goods at the wharf. But the carrier was duty bound to notify the consignee of the vessel's arrival and the time of discharge. The carrier was also obliged to discharge its cargo at a fit wharf, to separate each consignment so as to afford the consignee ready access for inspection and removal, and to protect the cargo until the consignee had a reasonable opportunity to remove it from the wharf. If the consignee failed to remove his goods within a reasonable time, the carrier could relieve itself from further responsibility only by depositing the goods in a warehouse for the account of the consignee. Richardson v. Goddard (The Tangier), 1859, 23 How. 28, 64 U.S. 28, 38, 16 L.Ed. 412; The Eddy, 1866, 5 Wall. 481, 72 U.S. 481, 495, 18 L.Ed. 486; The Titania, 2 Cir., 1904, 131 F. 229; Vose v. Allen, C.C.S.D. N.Y.1855, Fed.Cas.No.17,006, affirming D.C. S.D.N.Y.1854, Fed.Cas.No.17,005; Dibble v. Morgan, C.C.E.D.Tex.1873, Fed.Cas.No. 3,881; Warner v. The Illinois, C.C.E.D.Pa. 1884, Fed.Cas.No.17,184a; The Mary Washington, C.C.Md.1865, Fed.Cas.No.9,229; The Middlesex, C.C.Mass.1857, Fed.Cas. No.9,533; The Grafton, D.C.S.D.N.Y.1844, Fed.Cas.No.5,656, affirmed, C.C.S.D.N.Y. 1846, Fed.Cas.No.5,655.

But these were the elements of a "proper" delivery only when the custom, regulations, or law of the port did not otherwise provide. As the Supreme Court stated in Constable v. National Steamship Company, 1894, 154 U.S. 51 at page 63, 14 S.Ct. 1062, 1067, 38 L.Ed. 903, "No rule is better settled than that the delivery must be according to the custom and usage of the port, and such delivery will discharge the carrier of his responsibility."[3] The common-law did not permit less[4] nor require more[5] in the way of delivery than the usage or law of the port dictated.

Cases, holding that a carrier's delivery to persons charged by the law and usage of the port with the duty to receive cargo and distribute it to the consignee is a good delivery on the part of the carrier, are footnoted.[6]

It is true that delivery to customs or other authorities does not relieve the carrier of responsibility for cargo, if such authorities are not actually charged by law or usage with the duty to receive cargo and distribute it to the consignees[7] or if such authorities take control of cargo only because the carrier negligently fails to comply with customs regulations.[8] But in the present case Philippine law did require respondent to deliver all cargo to the customs agents who were charged with com-

---

3. See also Angell on Carriers §§ 305–316 (5th Ed. 1877); 2 Hutchinson on Carriers §§ 696, 700 (3rd Ed. 1906); 1 Michie on Carriers, § 846 (1915). For a Supreme Court dictum that regard may be had to the custom of the port in determining what constitutes a proper delivery under the Harter Act, see Calderon v. Atlas Steamship Company, 1898, 170 U.S. 272, 276, 18 S.Ct. 588, 42 L.Ed. 1033.

4. The Boskenna Bay, D.C.S.D.N.Y.1884, 22 F. 662; The Port Adelaide, D.C.S.D.N.Y. 1889, 38 F. 753; Hewlett v. Burrell, 2 Cir., 1900, 105 F. 80.

5. Bradstreet v. Heran, D.C.S.D.N.Y.1848, Fed.Cas.No.1,792, affirmed on other issues, C.C.S.D.N.Y.1849, Fed.Cas.No.1,- 792a; Blossom v. Smith, C.C.S.D.N.Y. 1855, Fed.Cas.No.1,565, reversing, D.C. S.D.N.Y.1854, Fed.Cas.No.1,566; The Mill Boy, D.C.E.D.Ark.1882, 13 F. 181.

6. Petrocochino v. Bott, L.R., 9 C.P. 355; 43 L.J.C.P. 214 (1874); British Shipowners' Co. v. Grimond, 3 Court of Session Cases 4th Series 968 (1876), and Knight S. S. Co. v. Fleming, 25 Court of Session Cases 4th Series 1070 (1898); The Seguranca, D.C.S.D.N.Y.1895, 68 F. 1014; Herbst v. The Asiatic Prince, D.C. S.D.N.Y.1899, 97 F. 343, affirmed, 2 Cir., 1901, 108 F. 287, certiorari denied, 1901, 183 U.S. 697, 22 S.Ct. 933, 46 L.Ed. 395; The Milwaukee Bridge, D.C.S.D.N.Y. 1926, 15 F.2d 249, affirmed, 2 Cir., 1928, 26 F.2d 327, certiorari denied sub nom. Moore v. United States, 1928, 278 U.S. 632, 49 S.Ct. 31, 73 L.Ed. 550.

7. Redmond v. Liverpool, New York and Philadelphia Steamboat Co., 1871, 46 N. Y. 578.

8. Howland v. Greenway, 1859, 22 How. 491, 63 U.S. 491, 16 L.Ed. 391.

436

plete responsibility for safe delivery to the consignees.

A further contention of libelants is that the law of the Philippines cannot lessen the obligation to make proper delivery imposed by the law of the United States. This may be so, but such is not the effect of the Philippine law. For the law of the United States is that a "proper delivery" is a delivery made in accordance with the usage or law of the port of destination.

It is also urged that a delivery according to the usage or law of the port cannot be a proper delivery if cargo is thereby subjected to unusual risks. This might be true if the risks to which a particular shipment were subjected were unusual in relation to the risks ordinarily involved in making delivery as required by the usage or law of the port. See Stone v. Rice, 1877, 58 Ala. 95. But, any such rule has no applicability to the present case since the risks inherent in making delivery in accordance with the law at Manila had long existed and were well known to both libelants and respondent.

The fact that port usage or law may subject cargo to risks that are not incident to a normal delivery at other ports is immaterial in itself. The very value of a peculiar port usage or regulation may lie in the fact that it is a product of endeavors to arrive at the best balance between the difficulty in making a normal delivery at the port and the risk to the cargo in making a modified delivery. See The Mill Boy, D.C.E.D.Ark.1882, 13 F. 181. The courts do not attempt to strike this balance anew. Port usage or custom need only meet the test of reasonableness under all the circumstances.[9] Port law, which, unlike custom, is mandatory, has apparently always been accepted by the courts as the determinant of a proper delivery without inquiry as to its reasonableness. But be that as it may, there is nothing unreasonable about the requirement that all cargo unladen at Manila be delivered to consignees

through the Manila Terminal Company. While cargo lay on the Manila piers awaiting removal by consignees, it was subjected to risks which were the product of general public disorder. There is no reason why such cargo should have been in any greater danger in the custody of the Manila Terminal Company than if it had remained under the control of the carrier. If, as has been stipulated, it was beyond the power of local authorities, with all the resources of government at their command, to prevent looting on the Manila piers, it is unlikely that carriers could have done so.

Inasmuch as respondent fully performed the duty to "properly deliver" imposed by the Harter Act, it is unnecessary to consider respondent's contention that that Act was not applicable to libelants' shipments.

A decree may enter for respondent.

9. Liverpool & Great Western Steam Co. v. Suitter, D.C.E.D.N.Y.1883, 17 F. 695, affirmed, C.C.E.D.N.Y.1884, 22 F. 560; Strong v. Certain Quantity of Wheat, D. C.N.D.N.Y.1863, Fed.Cas.No.13,541, affirmed unreported decision, C.C.N.D.N.Y., affirmed The Convoy's Wheat, 1865, 3 Wall 225, 70 U.S. 225, 18 L.Ed. 194; The Middlesex, C.C.Mass.1857, Fed.Cas.No. 9,533.