**BETESH et al. v. FIRE ASS'N OF PHILADELPHIA.**

No. 178, Docket 21916.

United States Court of Appeals Second Circuit.

Argued Feb. 15, 1951.

Decided March 8, 1951.

Albert Adams, of New York City (Ferris & Adams, of New York City, on the brief), for plaintiffs-appellants.

Martin P. Detels, of New York City (Bigham, Englar, Jones & Houston and Daniel A. Sullivan, all of New York City, on the brief), for defendant-appellee.

Before AUGUSTUS N. HAND, CHASE, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

Plaintiffs appeal from a judgment dismissing their complaint as liquidating directors of the European Linen Importing Corporation in an action on a war risk insurance policy for goods lost during the Japanese wartime occupation of Hongkong. Federal jurisdiction was rested upon the diverse citizenship of the parties. The

substantial question is whether or not the undoubted loss of the goods can be found to have occurred within the period of coverage of the policy.

In the fall of 1941, plaintiff Isaac Betesh, then an officer of European Linen Importing Corporation, ordered four cases of embroidered linen goods from one Raymond J. Beyda of Shanghai and paid him $6,500 in American funds in advance. Beyda did business on his own account in the offices of Tung Mow Company, who customarily and in this case bought and shipped the goods for Beyda for a commission. It was planned to send the goods aboard the steamer Pakhoi from Shanghai to Hongkong, where they were to be transshipped to the United States by either the S. S. Tamesis or other available ships as noted below.

■ There is no positive evidence that the goods reached Hongkong; but Beyda testified that he saw them packed at Shanghai, and he identified as pertaining to Betesh's goods an "on board" bill of lading from the M/S Pakhoi of the Barber-Wilhelmsen Line. Appellee objected to its introduction on the ground that Tung Mow, not Beyda, was the shipper; but we think that it was properly received upon Beyda's evidence and that because of the presumption normally attaching to such bills, cf. Carriage of Goods by Sea Act, 46 U.S.C.A. §. 1303(4), the trial court's finding of fact that the "goods were shipped on the 'Pakhoi' from Shanghai to Hong Kong" must be sustained.

The deposition of Captain William Lumsden, marine superintendent of the Pakhoi's agents at Hongkong, said that the vessel arrived in Hongkong November 24, and that by the 26th her cargo was discharged and "placed in godowns [warehouses] awaiting delivery or reshipment." The trial court so found. The goods, however, never were loaded on the S. S. Tamesis, for on December 1, 1941, that vessel cleared Hongkong for Singapore without loading, under what Captain Lumsden stated were "current emergency regulations" promulgated by the "Royal Naval Authorities." The precise nature of these orders, their origin, and whether or not subject to penalties for disobedience were not shown; in response to the court's inquiry, plaintiffs' counsel asserted that this was because the British Consul at Hongkong refused to divulge anything except to the United States Department of State, and at the time of the trial the latter had no knowledge. According to Lumsden his authority for the date of the Tamesis' departure was "the Marine Department of the Government of Hong Kong"; but his further answer assigning the reason for it was based only "on information received from Dodwell & Co.," the carrier's agents who signed the original bill of lading. The trial court therefore struck out this particular answer as being "double" or "treble hearsay."

■ On December 8, 1941, local time, the Japanese staged an air attack on Hongkong, which apparently did little, if any, damage to the city and did not directly affect the goods in question.[1] The Japanese did not land on the island of Hongkong until the 18th; the island was surrendered on the 25th, and its occupation completed on the 26th. There is no evidence that the goods were lost or harmed prior to the surrender. The coverage of the policy ceased, under its provisions quoted below, within fifteen days after its unloading, or on December 9 at midnight. But plaintiffs insist that there was a constructive total loss of the goods before that time because Hongkong, even before its occupation, was in a "war zone" and because the enforced sailing of the Tamesis was "restraint of princes" within the

---

1. The evidence in the record as to this is also general, resting on extracts from the World Almanac and the New York Times; the latter in its issue of December 9, 1941, quoted a communique of the previous day from British headquarters in Hongkong stating that in "a raid this afternoon a few bombs were dropped, but the raiders scattered as soon as they were fired on, and damage and casualties were not extensive." It went on to say that one Japanese plane was reported "shot down over Green Island," 1½ to 3 miles to the west of the island of Hongkong.

terms of the policy. The district court rejected these contentions, and we think rightly so on the evidence before it, and its findings of fact, sustained by the evidence.

The insurance policy follows the best traditions of marine insurance in comprising a bundle of provisions which must be carefully sorted apart. First there is a policy of marine insurance in usual form which in its F. C. & S. clause excluded all loss from war risk, so much so in fact that no claim under that policy is made here. Next there is the war risk policy which insured against some, but not all, of the risks excluded from the marine policy. An appealing feature of the plaintiff's case here is that the loss was undoubtedly due to what in popular view was clearly a "war risk." Nevertheless we must observe the limitations set by the parties in the contract they made.

The governing policy carefully insured the Importing Corporation's shipments "against War Risks only in accordance with the terms and conditions hereinafter set forth and endorsed hereon." Then followed twelve numbered provisions. Number 1 is the general war risk coverage in historic form.[2] Number 2 is the now famous "Frustration Clause" discussed below, *viz.*, "Warranted free from any claim based upon loss of, or frustration of, the insured voyage or adventure caused by arrests, restraints or detainments." Numbers 3 and 4 contain limitations, of which subd. (c) of Clause 4 is here important; it provides that the insurance shall not attach to the interest insured "at a port or place of transhipment to another over-

seas Vessel after the expiry of fifteen days (counting from midnight of the day on which the overseas Vessel entering with the interest is safely anchored or moored) until the interest is on board the oncarrying overseas Vessel." The policy also contained the assured's warranty "not to abandon (on any ground other than physical damage to ship or cargo) until after condemnation of the property insured."

■ Of course we accept the English precedents upon these well-known provisions. Queens Ins. Co. of America v. Globe & Rutgers Fire Ins. Co., 263 U.S. 487, 490, 493, 44 S.Ct. 175, 68 L.Ed. 402. And while there is no doubt under English statutes, Marine Insurance Act, 1906, 6 Edw. VII, c. 41, § 30(2), Rule 10 for construction of policies, and case law as well, that restraint of princes may consist simply of executive orders of the sovereign, Miller v. Law Accident Ins. Co., [1903] 1 K.B. 712 (C.A.), for violations of which the carrier may be punished, British and Foreign Marine Ins. Co., Ltd. v. Sanday & Co., [1916] 1 A.C. 650, 659, it has always been the rule that the restraint must be the proximate cause of the loss and that mere fear of peril is insufficient. Becker, Gray & Co. v. London Assurance Corp., [1918] A.C. 101, 113. As this court has held in the past, the same is true in the United States. Baker Castor Oil Co. v. Insurance Co. of North America, 2 Cir., 157 F.2d 3, certiorari denied 329 U.S. 800, 67 S.Ct. 494, 91 L.Ed. 684; cf. United States v. Standard Oil Co. of New Jersey, 2 Cir., 178 F.2d 488, 490, affirmed Standard Oil Co. of New Jersey v. United States, 340 U.S. 54, 71 S.Ct. 135; Crist v. United

2. "1. This insurance is only against the risks of capture, seizure, destruction or damage by men of war, piracy, takings at sea, arrests, restraints and detainments and other warlike operations and acts of kings, princes and peoples in prosecution of hostilities or in the application of sanctions under international agreements, whether before or after declaration of war and whether by a belligerent or otherwise, including factions engaged in civil war, revolution, rebellion or insurrection, or civil strife arising therefrom, and including the risks of aerial bombardment, floating or station-

ary mines and stray or derelict torpedoes; but excluding claims for delay, deterioration and/or loss of market, and warranted not to abandon (on any ground other than physical damage to ship or cargo) until after condemnation of the property insured. Also warranted not to abandon in case of blockade, and free from any claims for loss or expense in consequence of blockade or of any attempt to evade blockade; but in the event of blockade, to be at liberty to proceed to an open port and there end the voyage."

States War Shipping Administration, 3 Cir., 163 F.2d 145, 152, certiorari denied 332 U.S. 852, 68 S.Ct. 352, 92 L.Ed. 422.

Under these authorities we cannot find liability upon the part of the defendant on this record. The court below has made various findings against the plaintiffs' claim, and to the effect that there was no evidence of loss or damage to the goods before midnight of December 9, 1941. The court also found that the Tamesis sailed from Hongkong without cargo on December 1, but it made no findings as to the reasons therefor; it did find, in accordance with the provisions of the bill of lading, that transshipment at Hongkong could be not only to this vessel, but to other ship or ships of the Barber-Wilhelmsen Line or other lines. The court then adds several conclusions of law to the effect that Hongkong was a port of transshipment for the insured within the meaning of Clause 4(c) quoted above, and that no loss under the policy was shown, since the proximate cause of the loss of the insured goods was the invasion of the island of Hongkong on December 18, 1941, followed by its subsequent capture on December 25. We think the findings and conclusions must stand. Whatever the general and proper fears developed by the oncoming crisis, there was no showing of any restraint operating upon the goods within the period of policy coverage. And even if we go so far as to assume that the Tamesis did sail under governmental orders, there was no showing that the restraint as to it operated on the goods then in the godowns or proximately caused their loss.

The history of the "Frustration Clause," Clause 2 of the policy, supra, supports this conclusion. In British and Foreign Marine Ins. Co., Ltd. v. Sanday & Co., supra, it was held that a declaration of war directly caused a loss because further prosecution of the voyage became illegal. To abrogate this rule the "Frustration Clause" was introduced to pitch liability on damage to the goods, rather than mere frustration of the voyage. Thus the insurance must still be in effect when the goods are lost; and, as we have held, that is not the case here. Rickards v. Forestal Land, Timber & Rys. Co., Ltd., [1942] A.C. 50, is not to the contrary, for there the restraint operated directly on the goods themselves, and the loss was obviously unavoidable from the moment of the restraint.

 Plaintiffs rely strongly upon Scheer v. Hanover Fire Ins. Co., Sup., 96 N.Y.S. 2d 873, affirmed without opinion, 277 App. Div. 1096, 100 N.Y.S.2d 1023, involving a somewhat similar loss of goods in Manila at this time. There the trial judge found a constructive loss of the goods before December 12, 1941, but his recital of facts found goes much beyond anything justified on this record and shows, *inter alia,* that civilians had no recourse with regard to the salvaging of their goods from the piers at Manila after the initial attack on December 8. We may regret that gaps in the proof could not be filled in here, but we must take the record as we find it. The plaintiffs had the burden of proving loss within the time limits of the policy. New York & Cuba Mail S. S. Co. v. Continental Ins. Co., 2 Cir., 117 F.2d 404, 408, and cases there cited. But even were the rule otherwise, the judge would naturally have had to conclude, as he did, that there was no loss within the time set by the agreement of the parties.

Affirmed.