**INTERNATIONAL HARVESTER CO., Plaintiff,**

v.

**TFL JEFFERSON, her engines, boilers, etc. and P & O Strath Services, Ltd., Defendant.**

**No. 85 Civ. 1606 (JES).**

United States District Court, S.D. New York.

Sept. 21, 1988.

Walker & Corsa, New York City, for plaintiff; Hollis M. Walker, Lenore E. McQuilling, of counsel.

Kirlin, Campbell & Keating, New York City, for defendant; J. Scot Provan, of counsel.

## OPINION AND ORDER

SPRIZZO, District Judge:

◼ In this admiralty action, plaintiff International Harvester Company seeks recovery for damages it sustained for nonpayment of a shipment of offset disk harrows. Plaintiff has moved for summary judgment, alleging that defendant P & O Strath Services, Ltd. ("P & O Strath") breached the contract of carriage and statutory duties by delivering the merchandise to the consignee without obtaining surrender of the order bill of lading and that plaintiff suffered a loss as a result of that breach.[1] Oral argument was held and defendant was subsequently given an opportunity to supplement the record, which it failed to do. For the reasons that follow, the Court concludes that plaintiff's motion must be granted.

## BACKGROUND

The following facts are undisputed.

On or about April 18, 1984, plaintiff delivered to the TFL JEFFERSON at the port of New Orleans a shipment of offset disc harrows to be transported to Port Sudan. *See* [Plaintiff's] Rule 3(g) Statement ("Pl. 3(g) Stmt.") at ¶ 11; [Defendant's] Statement Pursuant to Local Civil Rule 3(g)

---

1. The complaint also names Southern Steamship Agency, Inc. ("Southern Steamship") as a defendant, but the action was voluntarily discontinued as to Southern Steamship by stipulation filed on January 7, 1986. Although the remaining defendant, the TFL JEFFERSON, has not been dismissed, the ship has never been arrested and plaintiff has failed to establish any set of facts upon which the vessel could be liable for plaintiff's loss. Indeed, plaintiff does not address the liability of the ship at all in its moving papers. Thus, the action is dismissed as to the TFL JEFFERSON, and hereinafter the term "defendant" will refer to P & O Strath.

("Def. 3(g) Stmt.") at ¶ 11. Shipment was to be made pursuant to the terms of a negotiable "order" bill of lading issued by defendant's agent which listed plaintiff as the shipper and named the Rahad Corporation as consignee. *See* Pl. 3(g) Stmt. at ¶ 12; Def. 3(g) Stmt. at ¶¶ 11–12; Affidavit of Lenore E. McQuilling in Support of Plaintiff's Motion for Summary Judgment ("McQuilling Aff.") Ex. F; *see also* 49 U.S.C. § 83 (order bill of lading). At the Port of Felixstowe, the cargo at issue was transhipped aboard the vessel UBENA to Port Sudan and subsequently discharged at the port facility in Sudan operated by the Seaports Corporation, a government department serving as the port authority. *See* Pl. 3(g) Stmt. at ¶ 13; Def. 3(g) Stmt. at ¶ 13; Affidavit of Hamid Mohamed Fadul ("Fadul Aff.") at ¶¶ 4–6, 9.

The customs and regulations of the port required that all cargo discharged at Port Sudan be delivered to the Seaports Corporation. *See* Fadul Aff. at ¶ 6. Ultimate delivery of cargo was performed by the Seaports Corporation after the consignees obtained a Delivery Order from Red Sea Shipping & Services Co., Ltd. ("Red Sea" or "Red Sea Shipping"), a corporation owned by the government of Sudan which served as the agent for defendant's managing agent at Port Sudan. *See* Fadul Aff. at ¶¶ 2, 5, 9; Deposition of Charles Rice at 9 ("Rice Dep.").[2]

A Delivery Order was normally obtained by a consignee's submitting the original bill of lading to Red Sea Shipping. *See* Fadul Aff. at ¶ 5. This procedure was applicable even where the consignee was a government agency, in which case the Government Cargo Agent was required to submit the original bill of lading to Red Sea in exchange for the Delivery Order. *See id.* at ¶¶ 10–11.

As noted above, the consignee of the cargo in question was the Rahad Corporation, a department or enterprise of the Ministry of Agriculture of the government of Sudan. *See* Fadul Aff. at ¶ 12. Notwithstanding the procedure described above, the Government Cargo Agent did not submit the original bill of lading for the cargo to Red Sea. Instead, a representative of Rahad advised Red Sea that although they had not received the original bill of lading, they needed the cargo for use in planting at the Rahad Project. *See id.* at ¶ 16. According to Red Sea's General Manager,

> [the Rahad Corporation representative] told Red Sea Shipping that the Minister of Agriculture was insisting that the Cargo should be at the Rahad Project, otherwise, the Rahad Corporation would miss the season for planting. Then he produced a letter of Guarantee duly filled [sic] and accomplished by the Government Cargo Agent. In response to this pressure from a Government Organization and in view of the instructions from Ministry of Agriculture, Red Sea Shipping issued the Delivery Order in exchange for the Guarantee from the Government Cargo Agent.

*Id.* The Guarantee provides that the Government Cargo Agent will produce bills of lading and other relevant documents, will pay all freight charges, and will hold Red Sea Shipping harmless and pay the value of the cargo if it is later found that the cargo belongs to someone else. *See* McQuilling Aff. Ex. I. Pursuant to Sudanese law, the letter of guarantee is to be treated as a bank guarantee. *See* Reply Affidavit in Support of Plaintiff's Motion for Summary Judgment, Ex. K.

Despite the issuance of the letter of guarantee, plaintiff was not paid for the cargo, which the parties agree was worth $316,796.89, by either the consignee or defendant. *See* Pl. 3(g) Stmt. at ¶ 17–18;

2. At the time of the events in question, Red Sea Shipping was known as Coptrade. *See* Rice Dep. at 41. However, throughout their papers the parties refer to the corporation as Red Sea Shipping so the Court will do the same.

Although defendant does not specifically admit that Red Sea served as its agent, *see* Def. 3(g) Stmt. at ¶ 9, it has submitted no evidence to the contrary. Moreover, the affidavit of Hamid Mohamed Fadul, submitted by defendant, indicates that Red Sea was the agent for Overseas Containers Limited ("OCL") at Port Sudan, *see* Fadul Aff. at ¶ 5, and the uncontroverted evidence indicates that OCL was the managing agent for defendant, *see* Rice Dep. at 9.

Def. 3(g) Stmt. at ¶ 16–17. Subsequently, however, after the present motion was filed, plaintiff received $284,967.20 in payment, apparently from the consignee. *See* Letter from Plaintiff's Counsel to the Court (Apr. 18, 1986); *see also* Letter from Defendant's Counsel to the Court (Apr. 30, 1986).

### DISCUSSION

Before discussing the parties' respective arguments and their merits, it is helpful to examine the relevant statutory law. Although the contract of carriage here involved transportation of goods between a United States port and a foreign port, the conduct at issue occurred after those goods were discharged by the ship and therefore is not governed by the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.App. §§ 1300–1315, which is limited in application to "the period from the time when the goods are loaded on to the time when they are discharged from the ship." *Id.* at § 1301(e).[3] Liability of the carrier for the period prior to loading and after discharge is governed by the Harter Act, 46 U.S.C. App. §§ 190–196. *See id.* at § 1311; *Leather's Best, Inc. v. S.S. Mormaclynx,* 451 F.2d 800, 816 (2d Cir.1971); *Gold Medal Trading Corp. v. Atlantic Overseas Corp.,* 580 F.Supp. 610, 613 (S.D.N.Y.1984). The Harter Act imposes a duty on a carrier to make proper delivery of the cargo and prohibits and nullifies attempts by carriers to "be relieved from liability for loss or damage arising from negligence, fault, or failure in ... proper delivery...." 46 U.S. C.App. § 190. An ocean carrier's delivery obligation is also affected by the Pomerene Bills of Lading Act, 49 U.S.C.App. § 81 *et seq.,* which provides that a carrier operating under an order bill of lading (such as in this case) is justified in delivering the goods to one lawfully entitled to them or to one in possession of a bill of lading payable to his order or properly endorsed to him or in blank by the consignee. *See id.* at § 89; *Allied Chem. Int'l Corp. v. Companhia de*

*Navegacao Lloyd Brasileiro,* 775 F.2d 476, 483–84 (2d Cir.1985), *cert. denied,* 475 U.S. 1099, 106 S.Ct. 1502, 89 L.Ed.2d 903 (1986). The Pomerene Act also provides that "[w]here a carrier delivers goods to one who is not lawfully entitled to the possession of them, the carrier shall be liable to anyone having a right of property or possession in the goods if he delivered the goods otherwise than as authorized by ... section 89 of this title [which requires delivery to consignee in possession of bill of lading]...." 49 U.S.C.App. at § 90.

Plaintiff contends that the undisputed facts establish that defendant or its agents released the goods to the consignee without requiring the consignee to produce the original bill of lading, and that therefore plaintiff is entitled to judgment as a matter of law holding defendant liable for misdelivery and conversion. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–52, 106 S.Ct. 2505, 2509–12, 91 L.Ed.2d 202 (1986). For the reasons that follow, the Court agrees.

### 1. *"Proper Delivery"*

■ Defendant does not dispute that it was obliged by the applicable statutory law to make proper delivery of plaintiff's cargo. *See* [Defendant's] Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment ("Def. Mem.") at 3. Instead, defendant argues that by discharging the cargo into the custody of the Seaports Corporation as required by local port customs and regulations, it satisfied its delivery obligation. *See id.* at 3–7; *see also Farrell Lines Inc. v. Highlands Ins. Co.,* 696 F.2d 28, 29 (2d Cir.1982) (per curiam). That argument is foreclosed, however, by *Allied, supra,* where a similar argument was rejected by the Second Circuit.

In *Allied,* as here, local custom and usage required that cargo be discharged into the custody of the government-controlled port authority. *See Allied, supra,* 775

---

**3.** Although the terms of COGSA can be incorporated by contract to govern the parties' relationship prior to loading or subsequent to discharge, *see Allied Chem. Int'l Corp. v. Companhia de*

*Navegacao Lloyd Brasileiro,* 775 F.2d 476, 483 (2d Cir.1985), *cert. denied,* 475 U.S. 1099, 106 S.Ct. 1502, 89 L.Ed.2d 903 (1986), there is no claim that that was done here.

F.2d at 479. Nevertheless, the evidence also established that a "carta declaratoria" issued by the defendant's agent authorizing release of the goods was required for the consignee to obtain the goods from the port authority unless the consignee presented the port authority with an original bill of lading. *See id.* at 479–80, 484. Thus, the Court held that the carrier had acted at its peril in issuing the carta declaratoria when the consignee had not produced the bill of lading, thereby permitting the consignee to take possession of the goods although it had not paid for them. *See id.* at 484; *see also id.* at 482 n. 3; *cf. Gold Medal Trading, supra,* 580 F.Supp. at 612–13.

That holding is dispositive here. The Fadul affidavit makes it clear that here, as in *Allied,* port customs and regulations required conduct by defendant above and beyond delivery of the goods to the Seaports Corporation. Red Sea, serving as defendant's agent, had an obligation to issue a Delivery Order *in exchange* for the original bill of lading. *See* Fadul Aff. at ¶¶ 9, 11, 18. By Red Sea's issuance of the Delivery Order even though the consignee had not submitted the bill of lading, defendant, like the defendant carrier in *Allied,* breached its delivery obligation and assumed the risk that the consignee would not pay for the goods.

■ *Allied* also forecloses defendant's argument that delivery was in accordance with the bill of lading, which provides that "[w]here at the place where the Carrier is entitled to call upon the Merchant to take delivery of the Goods … the Carrier is obliged to hand over the Goods into the custody of any customs port or other authority such hand-over shall constitute due delivery to the Merchant under this bill of lading." *See* Def. Mem. at 6 (quoting bill of lading, clause 20(6)). As the Second Circuit made clear in that case, a clause of this type is an invalid limitation of the carrier's liability under the Harter Act. *See Allied Chemical, supra,* 775 F.2d at 482; 46 U.S.C.App. § 190. Thus, this argument fails as well.

### 2. *Restraint of Princes & Impossibility*

■ Defendant's remaining arguments are not worthy of serious consideration. Defendant argues that the issuance of the Delivery Order was done pursuant to an order of the government of Sudan and that therefore it is not responsible for plaintiff's loss, *see* Def. Mem. at 8–11, relying on section 1304(2) of COGSA, which provides that "[n]either the carrier nor the ship shall be responsible for loss or damage resulting from … [a]rrest or restraint of princes, rulers, or people, or seizure under legal process…." 46 U.S.C.App. § 1304(2)(g). However, as noted above, COGSA does not apply after discharge of the cargo, and therefore does not govern plaintiff's loss.[4]

■ In any event, even if the restraint of princes defense set forth in COGSA were available here, the undisputed facts indicate that the conduct of the Sudanese government does not rise to the level of a restraint of princes for two reasons. First, the Port Sudan government entities clearly acted in a commercial capacity by issuing the letter of guarantee to protect defendant rather than in a sovereign capacity as required for the restraint of princes defense to be applicable. *See Baker Castor Oil Co. v. Insurance Co. of North America,* 157 F.2d 3, 4–5 (2d Cir.1946), *cert.*

---

4. It appears that the restraint of princes defense was not available at common law unless the parties provided for it by contract, *see* G. Gilmore & C. Black, *The Law of Admiralty,* § 3.22 at 139–40 (2d ed. 1975); 1 *Carver's Carriage by Sea,* ¶¶ 20, 225 (13th ed. 1982), and there is no argument that such a term was included here. However, the common law provided an exception to a carrier's absolute liability for the safe arrival of goods when the loss was caused by "the public enemy" or "the King's enemy" and the carrier was not at fault. *See* G. Gilmore & C. Black, *supra,* § 3–22 at 139–40; 1 *Carver's,*

*supra* ¶ 20. Nevertheless, because those terms refer "to acts done by states or peoples with which the Sovereign may be at war," 1 *Carver's, supra,* ¶ 14, this exception is more restrictive than the restraint of princes defense, which requires only the operation of the sovereign in its sovereign capacity controlling or divesting the dominion or authority of the owner over the ship and does not require acts done in times of war. *See Baker Castor Oil Co. v. Insurance Co. of North America,* 157 F.2d 3, 4–5 (2d Cir.1946), *cert. denied,* 329 U.S. 800, 67 S.Ct. 494, 91 L.Ed. 684 (1947).

*denied,* 329 U.S. 800, 67 S.Ct. 494, 91 L.Ed. 684 (1947). In addition, the Fadul Affidavit makes it clear that no force was used or threatened. The affidavit refers only to the statement of the Rahad representative that the Minister of Agriculture "was insisting" that the cargo be at the Rahad Project for planting and indicates that a letter of guarantee was offered in exchange for the Delivery Order. *See* Fadul Aff. at ¶ 16. The subjective belief that "this pressure" was "in effect an order," *see id.,* at ¶¶ 16–17, is insufficient as a matter of law to establish the restraint of princes defense. *See Betesh v. Fire Ass'n of Philadelphia,* 187 F.2d 526, 530 (2d Cir. 1951); *Baker Castor Oil, supra,* 157 F.2d at 5.[5]

■ Defendant's impossibility argument must also be rejected. Despite the subjective impression of Mr. Fadul, the facts do not permit an inference that Red Sea Shipping was ordered to issue the Delivery Order or that the government of Sudan otherwise prevented Red Sea from refusing to issue the Delivery Order until the original bill of lading was produced.

### 3. *Damages and Interest*

■ Defendant having failed to raise any triable issue of fact, plaintiff is entitled to the summary judgment it seeks for its damages, reduced by payments received. Although prejudgment interest is routinely awarded in admiralty cases absent extraordinary circumstances, *see Independent Bulk Transport, Inc. v. The Vessel "Morania Abaco,"* 676 F.2d 23, 25 (2d Cir.1982), neither party has briefed the issues of when interest commences or the applicable interest rate. These matters, however, are in the sound discretion of the Court. *See id.* Therefore, the Court will award prejudgment interest at a rate of nine percent from the time the cargo was wrongfully delivered.

**5.** Moreover, the Fadul Affidavit makes it clear that such requests for Delivery Orders without bills of lading had occurred in the past and that in those cases, the original bills of lading were always produced shortly thereafter. *See* Fadul Aff. at ¶ 19. Therefore, defendant's agents were

### CONCLUSION

As noted *supra,* plaintiff is entitled to judgment as a matter of law and its motion for summary judgment must therefore be granted. Plaintiff shall file an appropriate judgment within thirty days of the filing of this Opinion and Order.

It is SO ORDERED.

aware of the possibility that they might be asked to accept a letter of guarantee in lieu of the original bill of lading, and defendant could and should have provided for this type of situation by contract if it chose to do so.