**ACE BAG & BURLAP CO.,
INC., Plaintiff,**

v.

**SEA–LAND SERVICE, INC. and M/V
Sintra, her engines, tackle, equipment, etc., Defendants.**

**No. Civ.A. 96–6119(NHP).**

United States District Court,
D. New Jersey.

March 15, 1999.

234

Jeffrey S. Moller, Peter J. Boyer, Blank, Rome, Comisky & Mc Cauley, LLP, Cherry Hill, NJ, for plaintiff.

Andrew J. Goldstein, Michael E. Patunas, Goldstein, Lite & De Palma, Newark, NJ, Chester D. Hooper, James H. Hohenstein, Haight, Gardner, Holland & Knight, New York City, for defendant Sea Land Service, Inc.

*AMENDED LETTER OPINION*

POLITAN, District Judge.

### *ORIGINAL ON FILE WITH CLERK OF THE COURT*

This matter comes before the Court on defendant Sea–Land Service, Inc.'s Motion for Summary Judgment and plaintiff Ace Bag & Burlap Co., Inc.'s Motion for Summary Judgment. This matter was decided without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons stated herein, defendant Sea–Land Service, Inc.'s Motion for Summary Judgment is **GRANTED**. Furthermore, plaintiff Ace Bag & Burlap Co., Inc.'s Motion for Summary Judgment is **DENIED** and its' Complaint is **DISMISSED WITH PREJUDICE.**

### STATEMENT OF FACTS & PROCEDURAL HISTORY

Plaintiff Ace Bag and Burlap Co., Inc. ("plaintiff") is a corporation engaged in the business of manufacturing and trading burlap and jute bags. *See* Stipulation of Facts at ¶ 3. Defendant Sea–Land Service Co., Inc. ("Sea–Land") is engaged in the business of ocean carriage of merchandise. *See id.* at ¶ 5.

In May 1995, plaintiff made arrangements to purchase a quantity of jute bags from a manufacturer in Bangladesh with the intention of selling the jute bags to the Asociacion de Exportadores ("ADE-CAFE"), an association of Honduran coffee growers. *See id.* at ¶ 4. Thereafter, Sea–Land entered into a contract of carriage with a shipper (arranged by the Bangladeshi manufacturer) to carry five (5) twenty-foot containers constituting 180 bales of Hessian jute bags aboard the M/V SINTRA, an oceangoing vessel chartered and controlled by Sea–Land. *See id.* at ¶ 5. The goods were loaded in Chittagong, Bangladesh for carriage, through the port of Puerto Cortes, Honduras, to San Pedro Sula, Honduras. *See id.* at ¶ 6. On or

about May 30, 1995, Sea–Land issued Bill of Lading No. 324–026482 to the shipper evidencing the contract of carriage. *See id.* at ¶ 6.

During the ocean voyage, plaintiff became the owner of the jute bags, having obtained title by negotiating the original bill of lading from the shipper. *See id.* at ¶ 8. ADECAFE then contracted with plaintiff to purchase the 180 bales of Hessian jute. *See id.* at ¶ 9. The transaction with ADECAFE was to be consummated via site draft negotiation. *See id.* The original bill of lading was dispatched by plaintiff to a bank in Honduras to be delivered to ADECAFE upon payment of the sum of $90,000.00. *See id.* at ¶ 10.

The MV/SINTRA sailed from Bangladesh with the five containers on board and arrived at Puerto Cortes, Honduras on or about July 29, 1995. *See id.* at ¶ 7. Sea–Land then transported the goods to a leased lot where Sea–Land was met by Honduran Customs Authorities. *See* Declaration of Jorge R. Pineda at ¶ 5. It is undisputed that a customs broker, AGENCIA ADUANERA ARGUELLO, then submitted four petitions to the customs office requesting permission to move the containers from the leased lot to an inland warehouse. *See* Stipulation of Facts at ¶ 12. The customs office accepted the petitions without requiring presentment of the original bill of lading (which had been dispatched by plaintiff to a bank in Honduras) and issued Authorization Pass Nos. 006605, 06606, 06607, 06608. *See id.* Pursuant to authorization from the customs office, the containerized goods were transported by Sea–Land from the leased lot to the ALMACAFE Warehouse, a fiscal or "bonded" warehouse, which is authorized by the Customs Authorities of Honduras to store goods until customs clearance has been granted. *See id.* at ¶¶ 11, 13; *see also* Declaration of Jorge R. Pineda at ¶ 5. Thereafter, the goods were either disbursed or converted by persons unknown. *See id.* at ¶ 13. Neither ADECAFE nor any other person made payment to the

bank in exchange for the original bill of lading. Consequently, plaintiff never received payment for the goods, and the bank eventually returned the original bill of lading. *See id.* at ¶ 14.

## DISCUSSION

The issue before this Court is whether Sea–Land effectuated "proper delivery" of the five containers holding 180 bales of Hessian jute bags when it followed the Honduran Customs Authorities' order to transfer the cargo to the ALMACAFE fiscal warehouse without requiring presentment of the bill of lading.

Sea–Land contends that it is entitled to summary judgment because it discharged its duties as a carrier under the contract of carriage and bill of lading by properly delivering the goods, under mandatory Honduran Customs laws and regulations, to the ALMACAFE fiscal warehouse. Arguing that presentment of the bill of lading was not necessary since delivery was made to "a person entitled to possession," Sea–Land contends that it did, in fact, effectuate a proper delivery by safely delivering the goods to the port authorities at the leased lot and later, to the ALMACAFE warehouse. *See* Declaration of Jorge R. Pineda at ¶ 4.

Plaintiff, however, contends that Sea–Land did not properly deliver the goods because the authorization for transfer forms issued by the Honduran Customs Authority were not "mandatory" but were, instead, "permissive." Additionally, plaintiff asserts that, while it may be true that Sea–Land received "authorization" from customs officials to move the containers from the leased lot to the ALMACAFE fiscal warehouse, such "permission" does not alleviate Sea–Land's duty to be sure that the "authorizations" issued by the customs authorities were supported by original bills of lading.

## I. Standard of Review for Summary Judgment

The standard governing a summary judgment motion is set forth in Fed.

R.Civ.P. 56(c), which provides, in pertinent part, that:

> [t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Procedurally, the movant has the initial burden of identifying evidence that it believes shows an absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the movant will bear the burden of proof at trial, the movant's burden can be discharged by showing that there is an absence of evidence to support the non-movant's case. *Id.* at 325, 106 S.Ct. 2548. If the movant establishes the absence of a genuine issue of material fact, the burden shifts to the non-movant to do more than "simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In this matter, there are no genuine issues of material fact and therefore, summary judgment is appropriate.

## II. Standards Governing "Proper Delivery"

In this matter, the bill of lading, which evidences the contract of carriage, provides that the rights of the parties will be determined by the law of the United States. It is, therefore, critical to identify the relevant statutory law, the terms of which govern the within matter. The three relevant statutes in the present matter are, the: (1) Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1300, *et seq.;* (2) Harter Act, 46 U.S.C. § 190, *et seq.;* and (3) Pomerene Bills of Lading Act, 49 U.S.C. § 80101, *et seq.*

### A. COGSA and the Harter Act

■ COGSA provides that a carrier of goods in international commerce "shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." 46 U.S.C. § 1303(2). The Harter Act charges vessels with a duty of "proper loading, stowage, custody, care [and] proper delivery." 46 U.S.C. § 190. Significantly, the duty under the Harter Act cannot be avoided by inserting an exculpatory clause into the bill of lading. *See* 46 U.S.C. §§ 190, 191; *Tapco Nigeria, Ltd. v. M/V Westwind,* 702 F.2d 1252, 1255 (5th Cir.1983).[1] "Although the Harter Act was partially superseded by passage of the Carriage of Goods by Sea Act, COGSA defines the duty of care only from the time the goods are loaded on to the ship until the time when the cargo is released from the ship's tackle at port ... Consequently, the Harter Act is still applicable to any period between the discharge of the cargo from the vessel and its proper delivery." *Tapco Nigeria, Ltd.,* 702 F.2d at 1255 (citing *Allstate Insurance Co. v. Imparca Lines,* 646 F.2d 166, 168 (5th Cir.1981); *See also F.J. Walker, Ltd. v. M/V LEMONCORE,* 561 F.2d 1138, 1143 (5th Cir. 1977); *Pan American World Airways, Inc. v. California Stevedore and Ballast Co.,* 559 F.2d 1173 (9th Cir.1977)). Notably, ¶ 1 of the bill of lading in this matter extends COGSA from the point of discharge through delivery of the goods and, therefore, both COGSA and the Harter Act are equally applicable to the facts presented in this case.

■ Neither COGSA nor the Harter Act defines by its express terms what ac-

---

1. *See also Tan Hi v. United States,* 94 F.Supp. 432, 434 (N.D.Cal.1950) (noting that the Harter Act was "an outgrowth of a growing practice by carriers to insert clauses in their bills of lading unduly limiting their obligations to shippers.")

tions constitute "proper delivery." "There are surprisingly few cases that define 'delivery' within the context of COGSA." *Orient Atl. Parco, Inc. v. Maersk Lines,* 740 F.Supp. 1002, 1004 (S.D.N.Y.1990). The term is not defined within the statute, and each case is fact specific. *Id.* (citing *Atlantic Mutual Ins. Cos. v. M/V Balsa 38,* 695 F.Supp. 165, 167 (S.D.N.Y.1988)). The cases reveal, however, that, pursuant to COGSA, delivery is "something more than mere discharge of cargo," yet "something less than actual physical delivery." *Id.* (citations omitted). Delivery generally requires that "the consignee [ ] receive notice that the goods have been discharged and should have a reasonable opportunity to remove the goods or place them under proper care and custody." *Id.* (citing *National Packaging Corp. v. Nippon Yusen Kaisha,* 354 F.Supp. 986, 986–87 (N.D.Cal. 1972)). After the consignee has taken control of the goods, he or she must be given an opportunity to inspect them. *Id.* (citing *Lithotip, CA v. Steamship Guarico,* 569 F.Supp. 837, 839 (S.D.N.Y.1983)); *see also Atlantic Mutual,* 695 F.Supp. at 170. In sum, delivery pursuant to COGSA may be defined as the "discharge of the cargo with notice to the consignee and an opportunity for the consignee to inspect the goods for defects." *Orient Atl.,* 740 F.Supp. at 1005; *accord American Hoesch, Inc. v. Steamship Aubade,* 316 F.Supp. 1193, 1196 (D.S.C.1970); *Bottom Line Imports v. Korea Shipping Corp.,* 181 N.J.Super. 172, 177, 436 A.2d 978 (1981). Proper delivery, pursuant to the Harter Act, has been held simply to require the discharge of the goods "upon a fit and customary wharf." *Morse Electro Products Corp. v. S.S. Great Peace,* 437 F.Supp. 474, 486 (D.N.J.1977); *Allstate Insurance Co. v. Imparca Lines,* 646 F.2d 166, 168 (5th Cir.1981).

Therefore, although the terms of both COGSA and the Harter Act mandate that a carrier effectuate a "proper delivery," oftentimes courts must look to the common law in order to determine what conduct actually constitutes "proper delivery." *See Tan Hi v. United States,* 94 F.Supp. 432, 434–35 (N.D.Cal.1950).[2]

Notwithstanding the aforementioned obligations, there is a well-recognized and longstanding exception, which has been articulated by the United States Supreme Court and has, in time, come to modify the common law obligations of the carrier. The well-recognized exception can be articulated as follows: if the delivery is according to the **custom and usage of the port,** such delivery will discharge the carrier of his responsibility. *Constable v. National Steamship Co.,* 154 U.S. 51, 63, 14 S.Ct. 1062, 38 L.Ed. 903 (1894); *Tan Hi v. United States,* 94 F.Supp. 432, 435 (N.D.Cal.1950) (emphasis added). *See also Servicios–Expoarma, C.A. v. Industrial Maritime Carriers, Inc.,* 135 F.3d 984, 993 (5th Cir.1998) (holding that pursuant to Venezuelan port of destination, carrier "delivered" goods from first shipment when it transferred it to authorized customs warehouse); *Tapco Nigeria, Ltd. v. M/V Westwind,* 702 F.2d 1252, 1255–57 (5th Cir.1983) (opining that carrier properly delivered cargo when it delivered the goods to the "farthest point it could" within limitations of law, customs, and usage of the Nigerian port); *Farrell Lines, Inc. v.*

2. The Northern District Court of California explained,

The duty imposed by the common-law upon water carriers was merely to transport from wharf to wharf. The carrier was not bound to deliver at the warehouse of the consignee to receive goods at the wharf. But the carrier was duty bound to notify the consignee of the vessel's arrival and discharge. The carrier was also obliged to discharge its cargo at a fit wharf, to separate each consignment so as to afford the consignee ready access for inspection and removal and to protect the cargo until the consignee had a reasonable opportunity to remove it from the wharf. If the consignee failed to remove his goods within a reasonable time, the carrier could receive itself from further responsibility only by depositing the goods in a warehouse for the account of the consignee.

*Tan Hi v. United States,* 94 F.Supp. 432, 434–35 (N.D.Cal.1950) (citations omitted).

*Highlands Insurance Co.,* 532 F.Supp. 77, 79–80 (S.D.N.Y.) (holding that "proper delivery" occurred under Harter Act when the carrier relinquished custody and control of the goods to the National Port Authority of Monrovia), *aff'd,* 696 F.2d 28 (2d Cir.1982).

This exception will not apply, however, if the customs authorities are not actually "charged by law or usage with the duty to receive cargo and distribute it to the consignee or if such authorities take control of cargo only because the carrier negligently fails to comply with customs regulations." *Tan Hi v. United States,* 94 F.Supp. 432, 435–36 (N.D.Cal.1950).

■ In the present matter, Sea–Land does not dispute that it was obligated, pursuant to the relevant statutory law, to effectuate proper delivery of the goods. *See* Defendant Sea–Land's Brief in Support of Motion for Summary Judgment. Instead, Sea–Land first contends that by transferring the goods, under mandatory Honduran Customs laws and regulations, to the ALMACAFE fiscal warehouse, proper delivery was effectuated. Plaintiff, however, rebuts Sea–Land's argument by first asserting that Sea–Land did not properly deliver the goods because the authorization forms issued by the Honduran Customs Authority were not "mandatory" but, instead, were "permissive."

The Honduran Customs House Rules preliminarily provide that "All vehicles entering the national territory will be received by Customs and where appropriate, inspected by them and by the immigration, health and maritime authorities." *See* Affidavit of James H. Hohenstein, Esq., Exhibit 1, Title III, Chapter I, Article 15 of the Honduran Customs House Rules. *See generally* Declaration of Jorge R. Pineda. In this matter, it appears that the M/V SINTRA arrived in Honduras and trans-

ported the goods to a leased lot where the M/V SINTRA was met by Honduran Customs Authorities. *See* Declaration of Jorge R. Pineda at ¶5. The point of contention between the parties centers upon the fact that the goods did not come to rest at the leased lot but, instead, were transported to a temporary warehouse where the goods were ultimately pilfered.

The Honduran Customs House Rules, however, expressly provide that goods may be temporarily stored in a customs area or warehouse. *See* Affidavit of James H. Hohenstein, Esq., Exhibit 1, Title III, Chapter V, Article 43 of the Honduran Customs House Rules. Goods may be temporarily stored in a warehouse or other Customs area (such as a bonded warehouse) if, at the suggestion of the General Customs Department, the Minister of Finance considers the transfer "reasonable in response to commercial and industrial demands." *See id.* Therefore, it appears that the decision to transport the goods to the ALMACAFE warehouse for the purpose of continuing the process of gaining customs clearance remained solely within the discretion of both the Honduran General Customs Department and the Honduran Minister of Finance and not Sea–Land. Sea–Land simply complied with the request of the Honduran Customs officials and delivered the cargo to the ALMACAFE warehouse pursuant to the aforementioned Honduran Customs House Rules.[3] Thus, plaintiff's argument that the choice to deliver the goods to the ALMACAFE warehouse was somehow within the discretion of Sea–Land's agents is without merit in light of the actual terms of the Honduran Customs House Rules. Based upon the foregoing, Sea–Land effectuated a proper delivery under COGSA and the Harter Act when the cargo was delivered pursuant to the custom and usage of the Port.

---

3. *See* Affidavit of James H. Hohenstein, Esq., Exhibit 1, Title III, Chapter II, Article 24 of the Honduran Customs House Rules:

"**Article 24:** Captains and drivers of all means of transport are obliged:

(a) To permit and facilitate any inspection the Customs authorities make ..."

## B. The Pomerene Bills of Lading Act

Both parties agree that an ocean carrier's delivery obligation, however, is also affected by the Pomerene Bills of Lading Act, 49 U.S.C. § 80110, when that carrier is operating pursuant to an order bill of lading. The Pomerene Bills of Lading Act provides, in pertinent part, that a carrier conducting business pursuant to a bill of lading is justified in delivering the cargo to "a person lawfully entitled to their possession" *or* to one in actual possession of the bill of lading. 49 U.S.C. § 80110 (emphasis added).[4] *See generally Chilewich Partners v. M.V. Alligator Fortune, et al.*, 853 F.Supp. 744 (S.D.N.Y.1994). The Pomerene Bills of Lading Act expressly provides that where the carrier delivers goods to a person not entitled to their possession and without production of the bill of lading (unless the delivery is authorized under section 80110(b)(2) or (3) of this Act), the carrier shall be liable for damages to anyone having title to or a right to possession of the goods. 49 U.S.C. § 80111(a)(1). Thus, "delivery to a person *not entitled* to the goods *without production* of the bill of lading is prima facie evidence of a conversion of the goods and a breach of contract." *Allied Chemical Int'l Corp. v. Companhia de Navegacao Lloyd Brasileiro*, 775 F.2d 476, 481 (2d Cir.1985), *cert. denied*, 475 U.S. 1099, 106 S.Ct. 1502, 89 L.Ed.2d 903 (1986) (emphasis added); *see also Velco Enterprises, Ltd. v. S.S. Kingston*, 858 F.Supp. 36, 38 (S.D.N.Y.1994).

In order to effectuate the transfer of the cargo to the ALMACAFE fiscal warehouse, the Honduran Customs House Rules provide that a customs broker must produce the original bill of lading and commercial invoice to identify the goods which are the subject of the petition to transfer. *See* Affidavit of James H. Hohenstein, Esq. at ¶ 13 and Exhibit 1, Honduran Customs Bylaws of the General Warehouse of Deposit Article, Chapter V, Article 45; *See also* Declaration of Jorge Pineda at ¶ 6. The Customs House then transfers the identifying information to a transferential permit so that the foreign goods may be moved to an inland warehouse until customs clearance has been granted. *Id.*

In this matter, once the preliminary inspection was performed by a customs official, a customs broker, AGENCIA ADUANERA ARGUELLO, submitted four petitions to the Customs Office seeking permission to move the five containers from the leased lot to the ALMACAFE fiscal warehouse. *See* Stipulation of Facts at ¶ 12. As aforementioned, the ALMACAFE fiscal warehouse is authorized by the Customs Authorities of Honduras to store goods until customs clearance has been granted. *See* Stipulation of Facts at ¶ 11. However, the customs office accepted the petitions *without* requiring the presentment of the original bill of lading and issued the transferential permits, thereby authorizing the transport of the five containers to the ALMACAFE warehouse. *See* Stipulation of Facts at ¶¶ 12, 13.

Sea–Land argues that the Honduran Customs Laws "usurped" from Sea–Land the portion of delivery which would require collecting the original bill of lading (pursuant to the Pomerene Bills of Lading Act) since the Honduran Port Authority officials were "persons entitled to lawful possession." Plaintiff contends that, while it may be true that Sea–Land received

---

4. Specifically, 49 U.S.C. § 80110 provides, in pertinent part, that:
   **(b) Persons to whom goods may be delivered**—Subject to section 80111 of this title, a common carrier may deliver the goods covered by a bill of lading to—
   (1) a person entitled to their possession;
   (2) the consignee named in a nonnegotiable bill; or

(3) a person in possession of a negotiable bill if—
(A) the goods are deliverable to the order of that person; or
(B) the bill has been indorsed to that person or in blank by the consignee or another indorsee.

"authorization" from customs officials to move the containers from the MV/SINTRA to the ALMACAFE fiscal warehouse, such "permission" does not alleviate Sea–Land's duty to be sure that the "authorizations" issued by the customs authorities were supported by original bills of lading.

In this matter, proper delivery occurred pursuant to the Pomerene Bills of Lading Act when Sea–Land's agents delivered the goods first to the Honduran Customs authorities at the leased lot and, later, to the ALMACAFE warehouse because the Customs authorities were the persons entitled to the goods. Although the phrase "a person entitled to their possession" has been described by one Court as "elusive," this Court believes that the facts of this case indicate that Honduran Customs Authorities were the persons entitled to possession of the goods. *See generally Chilewich Partners v. M.V. Alligator Fortune, et al.,* 853 F.Supp. 744, 752 (S.D.N.Y. 1994).[5]

First, as a practical matter, it is worthy to note that the bill of lading was dispatched by plaintiff to a bank in Honduras and neither plaintiff's customer, ADECAFE, nor the Customs officials were in possession of the bill of lading when Sea–Land arrived at the port. Plaintiff's memoranda expressly indicates that, "[b]efore plaintiff's customer could obtain the bill of lading from the bank, however, the customer discovered that the goods had already been delivered to a local bonded warehouse and had, in whole or part, been disbursed or converted by unknown parties." *See* Plaintiffs' Memorandum in Support of Motion for Summary Judgment, page 4. Since neither the plaintiff's customer nor the customs officials were in possession of the bill of lading and the goods had arrived at the port, none of the parties were capable of actually presenting the bill of lading at the appropriate time. At that point, the goods were transferred

to a private bonded warehouse which, to this Court, appears to be a logical place for the goods to remain until such time as the bill of lading could be presented. Under the circumstances of this matter, the Honduran Customs authorities were persons entitled to possession.

Second, the two cases cited by plaintiff for the proposition that Sea–Land should be held liable for the "misdelivery" of the goods are so factually distinct from the stipulated facts presented in the matter at bar that a different result is warranted. *See generally Allied Chemical International v. Companhia de Navegacao Lloyd Brasileiro,* 775 F.2d 476 (2d Cir.1985), *cert. denied,* 475 U.S. 1099, 106 S.Ct. 1502, 89 L.Ed.2d 903 (1986) and *International Harvester Co. v. TFL Jefferson,* 695 F.Supp. 735 (1988).

The first case relied upon by plaintiff is a Second Circuit case, *Allied Chemical International v. Companhia de Navegacao Lloyd Brasileiro,* 775 F.2d 476 (2d Cir. 1985), *cert. denied,* 475 U.S. 1099, 106 S.Ct. 1502, 89 L.Ed.2d 903 (1986) (*"Allied Chemical"*), in which a shipper brought suit against an ocean carrier charging breach of contract and conversion. In accordance with local custom and usage, the carrier unloaded the goods at a warehouse which was under the control of the Brazilian Port Authority at the Port of Salvador. *Id.* at 479. The consignee then made payment on only one of the two sight drafts and, therefore, received from the Brazilian bank only one bill of lading. *Id.* Shortly thereafter, the consignee contacted the carrier requesting that the carrier issue a "carta declaratoria," a letter declaring that the freight had been paid at the port of origin and that the Merchant Marine Renewal Tax had been paid in Salvador. *Id.* The carrier granted the request. It was undisputed in *Allied Chemical* that in order to obtain the release of goods from the port authority, a party would have to pro-

---

5. Although the Honduran Customs officials overlooked the part of their procedures which provides that the Bill of Lading must accompany the transfer petition, such an omission clearly would not confer liability upon Sea–Land.

duce either the original bill of lading or a carta declaratoria from the carrier. *Id.* at 480. Thus, since the carrier issued the carta declaratoria, the consignee was able to receive the goods from the port authority despite the fact that it neither paid for the goods nor was in possession of the bill of lading. The Second Circuit held that the carrier was liable for misdelivery of the cargo since, by virtue of having issued the carta declaratoria, the carrier caused the goods to be released to the consignee. *Id.* at 484.

Likewise, in *International Harvester Co. v. TFL Jefferson,* 695 F.Supp. 735 (S.D.N.Y.1988) ("*Int'l Harvetser*"), a shipper sued a carrier for breach of contract. In accordance with the local custom and usage of the port, the carrier delivered the cargo discharged at Port Sudan to the Seaports Corporation. *Id.* at 737. The ultimate delivery of the goods was performed by the Seaports Corporation after the consignees obtained a Delivery Order from Red Sea Shipping, a corporation owned by the government of Sudan. *Id.* The typical procedure for obtaining a Delivery Order was by a consignee submitting the original bill of lading to Red Sea Shipping, even if the consignee was a government agency "in which case the Government Cargo Agent was required to submit the original bill of lading to Red Sea in exchange for the Delivery Order." *Id.* Notwithstanding the procedure, the Government Cargo Agent in *Int'l Harvester* did not submit the original bill of lading to Red Sea. *Id.* Instead, an agent of the consignee advised Red Sea that although they had not received the original bill of lading, the cargo was needed for a project. *Id.* Red Sea issued the Delivery Order in exchange for a "Guarantee" from the Government Cargo Agent. *Id.* The District Court held that the carrier misdelivered the goods since:

> port customs and regulations required conduct by defendant above and beyond delivery of the goods to the Seaports Corporation. Red Sea, serving as de-

fendant's agent, had an obligation to issue a Delivery Order in exchange for the original bill of lading. By Red Sea's issuance of the . Delivery order even though the consignee had not submitted the bill of lading, defendant, like the defendant carrier in *Allied,* breached its delivery obligation and assumed the risk that the consignee would not pay for the goods.

*Id.* at 739.

Thus, unlike the facts presented in the matter at bar, the carriers in both *Allied Chemical* and *Int'l Harvester* maintained control over the cargo by directing the Customs Authority to release the goods at a later point. In the present matter, the carrier did not instruct the Honduran Customs Authorities to deliver the goods to a third party. Moreover, the port custom and regulations did not impose upon Sea–Land any obligations beyond those already performed by Sea–Land. The goods were simply in the possession of the Honduran Customs Authorities at a temporary site until such time as a proper bill of lading could be produced.

Finally, once the carrier effectuates delivery of the cargo to a private bonded warehouse, such as the ALMACAFE warehouse, the carrier surrenders custody and control of the goods to the Honduran Customs Authorities. *See* Declaration of Jorge Pineda, at ¶ 3. The Honduran Customs Bylaws of the General Warehouse of Deposit Article, Chapter V, Article 31 provides:

> Private bonded warehouses providing storage facilities for foreign goods for a specific period, without paying Customs duty, **will be run under the permanent supervision and control of the relevant Customs administration.**

*See* Affidavit of James H. Hohenstein, Esq., Exhibit 1, Honduran Customs Bylaws of the General Warehouse of Deposit Article, Chapter V, Article 31 (emphasis added).

The Honduran Customs Bylaws of the General Warehouse of Deposit Article, Chapter V, Article 41 also provides that the "receipt, dispatch and general handling of goods in bonded warehouses will be the responsibility of the administrative staff of any warehouses accredited with the relevant Customs authorities."

## CONCLUSION

Thus, since Sea–Land discharged its duties as a carrier under the contract of carriage and bill of Lading by properly delivering the goods, under mandatory Honduran Customs laws and regulations, to the ALMACAFE fiscal warehouse, and since delivery was made to "a person entitled to possession" at that time Sea–Land's motion for summary judgment is **GRANTED**. Furthermore, Plaintiff Ace Bag & Burlap Co., Inc.'s motion for summary judgment is **DENIED** and its' Complaint is **DISMISSED WITH PREJUDICE**.

An appropriate Order accompanies this Opinion.

### *AMENDED FINAL ORDER*

**THIS MATTER** having come before the Court on defendant Sea–Land Service, Inc.'s motion for summary judgment and Plaintiff Ace Bag & Burlap Co., Inc.'s motion for summary judgment; and this Court having decided this matter pursuant to Federal Rule of Civil Procedure 78; and having considered the memoranda submitted by both parties; and for the reasons appearing more particularly in the Letter Opinion of this Court in the above-captioned matter; and for good cause shown,

**IT IS** on this 15th day of March, 1998

**ORDERED** that defendant Sea–Land Service, Inc.'s motion for summary judgment is **GRANTED**.

**IT IS FURTHER ORDERED** that plaintiff Ace Bag & Burlap Co, Inc.'s motion for summary judgment is **DENIED** and its' Complaint is **DISMISSED WITH PREJUDICE**.

**IT IS ALSO FURTHER ORDERED** that this case is closed.