BROCSONIC COMPANY,
LTD., Plaintiff,

v.

M/V "MATHILDE MAERSK," M/V "Marchen Maersk," M/V "Marit Maersk," M/V "Mette Maersk," their engines, boilers, tackle, etc., Maersk, Inc., Dampskibsselskabet AF 1912, Aktieselskab, and Aktieselskabet Dampskibsselskabet Svendborg, Defendants.

No. 98 Civ. 7546(LBS).

United States District Court,
S.D. New York.

Nov. 6, 2000.

Edward A. Keane, Mahoney & Keane, LLP, New York City, for Plaintiffs.

Peter J. Gutowski, Freehill Hogan & Mahar, LLP, New York City, for defendants Maersk, Inc., Dampskibsselskabet af 1912, Aktieselskab, and Aktieselskabet Dampskibsselskabet Svendborg.

## OPINION

SAND, District Judge.

This action by Brocsonic Company, Ltd. ("Brocsonic") relates to a transoceanic shipment of electronic goods from Kobe, Japan to Santos, Brazil. Defendants Maersk, Inc., Dampskibsselskabet af 1912, Aktieselskab, and Aktieselskabet Dampskibsselskabet Svendborg (collectively "Maersk") had previously moved this Court to dismiss the Complaint for lack of subject matter jurisdiction, but we denied that motion without prejudice to renewal so that the parties could conduct further discovery as to certain jurisdictional facts. Such discovery having been recently completed, Maersk now renews its motion to dismiss for lack of subject matter jurisdiction. This time, for reasons set forth below, we grant Maersk's motion and dismiss Brocsonic's Complaint.

## I. BACKGROUND

### A. FACTS

The following facts are undisputed. In July and August 1995, Brocsonic–a manufacturer and distributor of electronic products–contracted with Maersk–an in-ternational cargo carrier–to transport 11 shipping containers filled with electronic goods from Kobe, Japan to Santos, Brazil. *See* Xavier Decl. (June 14, 2000) Ex. A. Although the ultimate destination of these goods was Paraguay, the 11 port-to-port bills of lading only required Maersk to discharge and deliver the containers at Santos. *See id.;* Maersk's Renewed 56.1 Statement ¶¶ 8–9; Broker Dep. (Nov. 11, 1999) Tr. at 107; Hr'g (May 27, 1999) Tr. at 9. Brocsonic's role constituted that of both shipper and consignee. *See* Xavier Decl. (June 14, 2000) Ex. A.

All 11 containers arrived at the port of Santos on October 25–28, 1995. *See id.* Ex. B. Pursuant to local law and custom, the subject containers were immediately given over to the "Dock Company"[1]–a Brazilian state-owned entity charged with the stevedoring and in-bond storage of all cargo not otherwise intended for importation into Brazil. *See id.* ¶¶ 6–9, 13–14. The Dock Company operates under the auspices of the Brazilian Customs Authority, *see id.* ¶ 8, and maintains a separate storage facility for in-bond cargo destined for Paraguay, *see id.* ¶ 10. Before the Dock Company will physically release any stored in-bond cargo to a receiving claimant, the relevant carrier must first authenticate the bills of lading presented by the putative consignee.[2] *See* Xavier Dep. (Nov. 17, 1999) Tr. at 106–109; Hr'g (Oct. 5, 2000) Tr. at 3–5; Brocsonic's Mem. in Opp. to Renewed Mot. to Dismiss at 2–3.

After their discharge from Maersk vessels in late October 1995, the 11 containers of Brocsonic goods remained in bonded storage at Santos until April 1997.[3] *See*

---

1. Also known by the acronym "CODESP."

2. As part of this authentication procedure, the carrier must also verify that the consignee has in fact paid all applicable fees, taxes, and costs. *See* Xavier Dep. (Nov. 17, 1999) Tr. at 107; Hr'g (Oct. 5, 2000) Tr. at 3–4; Brocsonic's Mem. in Opp. to Renewed Mot. to Dismiss at 3.

3. Brocsonic avers in its renewed Rule 56.1 Statement that it lacks knowledge or informa-tion sufficient to form a belief as to the purported storage end-date of April 1997. Yet, Brocsonic's own motion papers submit April 26, 1997 as the approximate date on which third parties allegedly used fraudulent bills of lading to remove the subject cargo from in-bond storage. *See* Brocsonic's Mem. in Opp. to Renewed Mot. to Dismiss at 29. In sub-stance, even if not in form, Brocsonic does not seem to genuinely contest Maersk's asser-tion of when the electronic goods left storage.

Xavier Decl. (June 14, 2000) ¶ 23; Brocsonic's Mem. in Opp. to Renewed Mot. to Dismiss at 29. It further appears that at no time during this 18–month period did Brocsonic ever attempt to retrieve its cargo from storage. In fact, Brocsonic affirmatively sought to keep storing the subject goods at Santos indefinitely into the future.[4] *See* Broker Dep. (Nov. 11, 1999) Tr. at 99. As part of this post-discharge storage effort, Brocsonic negotiated with Maersk to amend the bills of lading such that Brocsonic would pay Maersk $10 per day in demurrage charges; in return, Maersk would continue renting to Brocsonic the various shipping containers that held Brocsonic's electronic goods.[5] *See id.;* Maersk's Renewed Mot. to Dismiss at 12 n. 12; Brocsonic's Mem. in Opp. to Renewed Mot. to Dismiss at 5.

Finally, sometime in April 1997, the cargo was withdrawn from in-bond storage by unauthorized third parties utilizing fraudulent papers.[6] *See* Xavier Dep. (Nov. 17, 1999) Tr. at 115–116; Maersk's Renewed Mot. to Dismiss at 7; Brocsonic's Mem. in Opp. to Renewed Mot. to Dismiss at 3–4; Maersk's Reply Mem. in Supp. of Renewed Mot. to Dismiss at 2–3. The goal of the instant litigation is to decide whom–whether Brocsonic as the shipper/consignee or Maersk as the contracted carrier–should

bear the cost of these "missing" electronic goods.

## B. PROCEDURAL HISTORY

Brocsonic filed its Complaint against Maersk in the Southern District of New York on October 23, 1998, seeking $63 million in damages for the loss of its cargo stored at Santos, Brazil. On March 8, 1999, pursuant to Rules 12(b)(1) and 56 of the Federal Rules of Civil Procedure, Maersk moved this Court to dismiss the action for lack of subject matter jurisdiction. Argument was held on May 27, 1999, and we thereafter denied Maersk's motion without prejudice to renewal in a Memorandum and Order filed on June 21, 1999. *See* 1999 WL 413456 (S.D.N.Y. June 21, 1999). We did so in light of affirmative representations by Brocsonic that, without any opportunity to perform jurisdictional discovery, it was disadvantaged in defending against dismissal. Accordingly, we denied Maersk's motion without prejudice to renewal and further ordered the parties to conduct limited discovery as to relevant jurisdictional facts.

On September 19, 2000, upon completion of the court-ordered discovery, Maersk renewed its motion to dismiss for lack of subject matter jurisdiction under Rules 12(b)(1) and 56. The sole question presently before us is whether Brocsonic's

---

The Court, for the purposes of this motion, therefore treats the storage end-date of on or about April 1997 as though it were an undisputed fact.

**4.** Maersk contends that Brocsonic delayed retrieving its cargo from Santos due to an unfavorable shift in Brazilian duty fees that rendered the price of Brocsonic goods no longer attractive in Paraguay. *See* Maersk's Renewed Mot. to Dismiss at 5–6. Brocsonic neither denies nor confirms this assertion. Regardless, for the purposes of this motion, we need not concern ourselves with the alleged impetus of Brocsonic's decision to keep its Santos cargo in extended storage. What matters here is that such storage was purposeful and that it indeed occurred.

**5.** There is a factual conflict between the parties as to whether this $10–per–day charge was meant to compensate Maersk, not only for continued container rental by Brocsonic,

but also to store Brocsonic's cargo. *See* Hr'g (Oct. 5, 2000) Tr. at 3; Maersk's Renewed Mot. to Dismiss at 12 n. 12; Brocsonic's Mem. in Opp. to Renewed Mot. to Dismiss at 5. We discuss in Section II.A. *infra* the effect, if any, of this incongruence. For now, it nonetheless remains clear that the negotiated agreement between Brocsonic and Maersk at least provided for post-discharge container rental.

**6.** Brocsonic characterizes this event as a "misdelivery" on the part of Maersk, *see* Hr'g (Oct. 5, 2000) Tr. at 10; Brocsonic's Mem. in Opp. to Renewed Mot. to Dismiss at 1, while Maersk views it instead as a "theft," *see* Maersk's Reply Mem. in Supp. of Renewed Mot. to Dismiss at 3. We address in footnote 11 *infra* the jurisdictional relevance, if any, of this conceptual disagreement.

cause of action lies outside this Court's admiralty jurisdiction.[7] After hearing oral argument on October 5, 2000, we reserved decision.

## II. DISCUSSION

█ Maersk renews its motion to dismiss pursuant to Rules 12(b)(1) and 56 of the Federal Rules of Civil Procedure. As we already noted in our earlier denial of Maersk's original motion, *see* 1999 WL 413456 at *2, in this context[8] Rule 12(b)(1) is the more appropriate vehicle for challenging subject matter jurisdiction. *See Kamen v. American Telephone & Telegraph Co.*, 791 F.2d 1006, 1010–11 (2d Cir. 1986); *Goodman v. Children's Television Workshop*, No. 98 Civ. 8348(SAS), 1999 WL 228396 at *2 (S.D.N.Y. April 19, 1999). A plaintiff "seeking to invoke the subject matter jurisdiction of the district court bears the burden of showing that he [is] properly before that court." *Scelsa v. City Univ. of New York*, 76 F.3d 37, 40 (2d Cir.1996). To that end, a plaintiff may be permitted limited discovery with respect to the jurisdictional issue. *See Filus v. Lot Polish Airlines*, 907 F.2d 1328, 1332 (2d Cir.1990). And if the defendant continues to challenge the jurisdictional allegations of the complaint, courts may resolve factual issues by considering evidence extrinsic to the pleadings. *See Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 932 (2d Cir.1998); *Kamen*, 791 F.2d at 1011; *Jarvis v. Cardillo*, No. 98 Civ. 5793, 1999 WL 187205 at *2 (S.D.N.Y. April 6, 1999).

## A. REMAINING FACTUAL DISPUTES

The core factual dispute centers around the degree of control supposedly exercised by Maersk over Brocsonic's goods as they remained stored in Santos during the 18–month period between late October 1995 and April 1997. Brocsonic contends that it agreed to pay Maersk $10 per day in post-discharge demurrage charges for two reasons: (1) so that Maersk would continue renting to Brocsonic the various shipping containers that held Brocsonic's Paraguay-destined goods; and (2) so that Maersk would handle the physical storage of these cargo-filled containers for so long as Brocsonic wanted the goods to stay in Santos. *See* Brocsonic's Mem. in Opp. to Renewed Mot. to Dismiss at 5. Maersk, however, argues that all demurrage fees it received were solely for container rental and that the Brazilian entity known as the Dock Company performed all post-discharge storage services required by Brocsonic. *See* Maersk's Renewed Mot. to Dismiss at 3 n. 2, 12 n. 12.

We find it unnecessary to resolve this factual conflict. First, Maersk has on many occasions voiced a willingness to concede, solely for the purposes of the present motion, that it retained control over the subject goods. *See id.* at 18–19. The actual source of Maersk's control thus becomes collateral to the instant motion to dismiss. Second, Maersk makes such a concession because it correctly comprehends that the mere fact of control, though pivotal for questions of liability, has no significant bearing on the existence of federal admiralty jurisdiction over Brocsonic's claims. Third, the contested storage agreement is not the only possible basis for arguing that Maersk exercised control

---

7. We note that the Complaint also asserts that there exists both diversity jurisdiction and pendent jurisdiction over Brocsonic's action. Yet Brocsonic provides absolutely no support for these arguments, even in response to repeated challenges to the contrary by Maersk in its motion papers. *See, e.g.,* Maersk's Renewed Mot. to Dismiss at 19–21. We can thus only assume that Brocsonic has abandoned its position that this Court has diversity and pendent jurisdiction over the instant action. Nor could Brocsonic successfully make

such a claim: (1) Both parties are aliens and so complete diversity is lacking; and (2) There exists no original federal claim to which Brocsonic's non-federal claims may append. The only possible basis for federal jurisdiction, if at all, is that of admiralty.

8. I.e., where a Rule 56 motion is brought solely on the grounds of lack of subject matter jurisdiction.

over Brocsonic's goods: Maersk has already admitted that the Dock Company would not have released in-bond cargo without first getting Maersk to authenticate the bills of lading presented by the putative consignee. *See* Xavier Dep. (Nov. 17, 1999) Tr. at 106–109; Hr'g (Oct. 5, 2000) Tr. at 3–5; Brocsonic's Mem. in Opp. to Renewed Mot. to Dismiss at 2–3. Therefore, at least for the purposes of this motion, we will consider Maersk to have had control over Brocsonic's goods during their 18–month–long storage in Santos.

## B. SUBJECT MATTER JURISDICTION

Justice Harlan once observed that "the boundaries of admiralty jurisdiction over contracts ... being conceptual rather than spatial, have always been difficult to draw." *Kossick v. United Fruit Co.*, 365 U.S. 731, 735, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961).[9] That admonition notwithstanding, the present case requires that we focus on what is ordinarily the last stage in the port-to-port shipping process–i.e., post-discharge and pre–delivery–and determine where within it, if at all, federal admiralty jurisdiction over the underlying shipping contract must end.

The rights and obligations of parties associated with a port-to-port maritime shipment are ordinarily governed by the underlying contract of carriage. And in most all shipments, there will invariably exist a time-lag separating the moment when cargo is physically discharged onto dry land on the one hand, from the moment when the consignee takes actual possession on the other. The transfer can rarely be instantaneous. And so, when litigation later stems from a contested event occurring wholly within this bracketed interval, how should district courts go about ascertaining whether or not admiralty jurisdiction applies? What tests should be employed? We start with first principles.

**9.** Brocsonic makes no argument relating to maritime torts, undoubtedly because the alleged misdelivery occurred entirely on land.

## 1. *First Principles*

■ At bottom is the baseline notion that the scope of federal admiralty jurisdiction over contracts is necessarily finite. Admiralty jurisdiction normally attaches only if the contract contains "reference to maritime service or maritime transactions." *North Pac. S.S. Co. v. Hall Bros. Co.*, 249 U.S. 119, 39 S.Ct. 221, 63 L.Ed. 510 (1919). Clearly, as a general matter port-to-port contracts of carriage fall into the above category. *See Thypin Steel Co. v. Asoma Corp.*, 215 F.3d 273, 277 (May 25, 2000) ("A bill of lading for ocean carriage is a maritime contract."); *Luckenbach S.S. Co. v. Coast Mfg. & Supply Co.*, 185 F.Supp. 910, 915–916 (E.D.N.Y.1960) ("A contract for ocean transportation of cargo such as set forth in the bill of lading herein, is a classical example of a maritime contract.").

■ This does not mean, however, that simply because an item was once transported across the sea pursuant to a bill of lading, admiralty jurisdiction permanently attaches to any and all disputes concerning that item. Admiralty jurisdiction is rightly linked to the action of ocean carriage itself, not to the subjects of such carriage. *See CTI–Container Leasing Corp. v. Oceanic Operations Corp.*, 682 F.2d 377, 380–381 (2d Cir.1982) (finding contract to lease cargo containers to be within court's admiralty jurisdiction since containers were leased specifically for use in ocean transportation.). That the touchstone of federal admiralty jurisdiction over maritime contracts should be maritime transport fully comports with the Supreme Court's recent reiteration that the "fundamental interest giving rise to maritime jurisdiction is 'the protection of maritime commerce.'" *Exxon Corp. v. Central Gulf Lines, Inc.*, 500 U.S. 603, 608, 111 S.Ct. 2071, 114 L.Ed.2d 649 (1991) (quoting *Sisson v. Ruby*, 497 U.S. 358, 367, 110 S.Ct.

We thus have no reason to address the issue of federal admiralty jurisdiction over maritime torts.

2892, 111 L.Ed.2d 292 (1990)); *see also Thypin Steel*, 215 F.3d at 279; *Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 199–200 (1992) ("Admiralty jurisdiction was created to provide a neutral federal forum and a uniform body of law to adjudicate rights and liabilities as they related to the trafficking of sea-faring vessels."); 1 Steven F. Friedell, *Benedict on Admiralty* § 105 (7th ed.2000).

Thus, admiralty jurisdiction even with respect to maritime contracts of carriage must end for some reason and at some time. The question is, of course, on what grounds and when. Brocsonic submits that admiralty jurisdiction over a maritime contract may only end upon actual delivery to the rightful consignee–i.e., only after delivery is properly effected. *See* Brocsonic's Mem. in Opp. to Renewed Mot. to Dismiss at 8–10; Hr'g (Oct. 5, 2000) Tr. at 11–12, 15–16. The problem with Brocsonic's position is that it confuses the horizon of liability for that of federal jurisdiction. Bills of lading will often continue to govern the rights and obligations of parties long after the paramount element of maritime transport has finished. For instance, the contract of carriage might call for cargo to be shipped via the sea from Vancouver to Hong Kong, and then driven inland by truck to New Delhi. If actual delivery were the test for continuing admiralty jurisdiction, then a traffic accident occurring on the road en route to India would give rise to an admiralty claim in a United States federal court. *Cf. New York Marine & Gen. Ins. Co. v. S/S "Ming Prosperity"*, 920 F.Supp. 416, 419–421 (S.D.N.Y.1996) (no admiralty jurisdiction over inland carriage leg of maritime shipment). Brocsonic's interpretation of the law cleaves admiralty jurisdiction from its foundational touchstone of maritime com-

merce.[10] *See generally* 1 Steven F. Friedell, *Benedict on Admiralty* § 182 (7th ed. 2000) ("In order to be considered maritime, there must be a direct and substantial link between the contract and the operation of the ship, its navigation, or its management afloat, taking into account the needs of the shipping industry, for the very basis of the constitutional grant of admiralty jurisdiction was to ensure a national uniformity of approach to world shipping.").

It should be clear, then, that admiralty jurisdiction over a maritime contract does not necessarily survive until all obligations under the contract have been fulfilled. The boundaries of admiralty jurisdiction will encompass some aspects of a carrier's liability, but they are certainly not universally coextensive. However, simply recognizing that admiralty jurisdiction may cease long before actual delivery occurs is not enough. The difficulty arrives in fashioning a coherent framework for determining at what point before actual delivery to the consignee, with respect to a particular set of facts, admiralty jurisdiction has expired. Because every case will necessarily have its own peculiarities, bright-line rules are illusive. Fortunately, two longstanding jurisdictional principles offer guidance: the doctrines of mixed contracts and constructive delivery.

### 2. *Doctrine of Mixed Contracts*

■ Admiralty jurisdiction traditionally exists in contract cases only if the contract sued upon is wholly maritime in nature. If the contract contains both maritime and non-maritime elements, admiralty jurisdiction generally is absent. *See Transatlantic Marine Claims Agency Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 109 (2d Cir. 1997). There are, however, two exceptions

---

**10.** Brocsonic attempts to limit its proposed rule to claims of misdelivery only, as opposed to damage or loss. *See* Brocsonic's Mem. in Opp. to Renewed Mot. to Dismiss at 8–10. This distinction does nothing to mitigate the problem of admiralty jurisdiction being extended far beyond its basic relationship to

maritime commerce. Furthermore, to build on the illustration given above, Brocsonic's analytical framework would illogically attach admiralty jurisdiction to a misdelivery that takes place en route to California, but not to a collision occurring at the identical time and place.

to this rule regarding "mixed contracts." Admiralty jurisdiction will still extend to the mixed contract if the non-maritime element of the contract is merely incidental to the maritime part, or if the non-maritime component of the contract can be disentangled from its maritime aspects and litigated separately. *See id.; see also* 1 Steven F. Friedell, *Benedict on Admiralty* § 183 (7th ed.2000).

■ By Brocsonic's own admission, its electronic goods were being stored at Santos pursuant to the original bills of lading. *See* Broker Dep. (Nov. 11, 1999) Tr. at 99; Brocsonic's Mem. in Opp. to Renewed Mot. to Dismiss at 5, 22–23. Accordingly, land-based storage was at least one element of the Brocsonic–Maersk contracts of carriage, thereby rendering them mixed contracts for purposes of our admiralty jurisdictional analysis.[11] As such, the overarching inquiry is whether or not the resulting 18 months of storage at Santos should be construed as being "incidental" to the maritime transport of Brocsonic's cargo from Kobe, Japan to Santos, Brazil.

The proposition that short-term, land-based storage can be deemed incidental to an ocean carriage of goods finds some support in existing case law. *See Moore–McCormack Lines, Inc. v. International Terminal Operating Co.,* 619 F.Supp. 1406, 1409 (S.D.N.Y.1985); *Hoogovens Estel Verkoopkantoor v. Ceres Terminals, Inc.,* No. 80 Civ. 6383(DBB), 1983 WL 604 at *3 (S.D.N.Y. April 26, 1983). Yet, in these cases, such storage occurred as part of the overall discharge and stevedoring process. *See Moore–McCormack,* 619 F.Supp. at 1409 ("The storage that does occur under the contract is incident to the performance of the numerous maritime services undertaken for the ocean carrier by [the stevedore]."); *Hoogovens,* 1983 WL at *3 ("[Defendant] Ceres' storage of the coils was plainly incidental to its duties as stevedore."). Short-term storage of this nature is a natural incident of global maritime transportation, occurring immediately after the cargo's arrival. The ship, after all, must quickly be unloaded and made available for the next round of carriage; the goods must also be prepared for retrieval by awaiting consignees. A significant indicator of incidental storage here is the likelihood that such storage is temporary, and that it usually takes place routinely and without the cargo owner's express request.[12] In other words, the goal of storage in these cases was never storage itself, but some other maritime purpose.

In this particular situation, however, the 18–month–long storage of Brocsonic's goods at Santos was distinctly not incidental. Brocsonic sought such storage purposefully by entering into post-discharge negotiations with Maersk to that effect. *See* Broker Dep. (Nov. 11, 1999) Tr. at 99; Brocsonic's Mem. in Opp. to Renewed Mot. to Dismiss at 5. The storage here served as an end-in-itself, and could not be said to have furthered some aspect of maritime commerce. Indeed, unloading and discharge of the cargo had long since been

---

11. We note that if Brocsonic and Maersk had entered into a separate contract for the land-based storage of cargo at Santos–i.e., not under the original bills of lading–the law is clear that admiralty jurisdiction does not extend to a suit over the breach of a storage contract. *See Pillsbury Flour Mills Co. v. Interlake S.S. Co.,* 40 F.2d 439, 440–441 (2d Cir.), *cert. denied,* 282 U.S. 845, 51 S.Ct. 24, 75 L.Ed. 750 (1930); *Orient Atlantic Parco, Inc. v. Maersk Lines,* 740 F.Supp. 1002, 1006 (S.D.N.Y.1990); *Doris Trading Corp. v. SS Union Enter.,* 406 F.Supp. 1093, 1096 (S.D.N.Y. 1976); *see also Roco Carriers, Ltd. v. M/V NURNBERG EXPRESS,* 899 F.2d 1292, 1295 (2d Cir.1990); *Colgate Palmolive Co. v. S.S.*

*Dart Canada,* 724 F.2d 313, 315–317 (2d Cir. 1983), *cert. denied sub nom.,* 466 U.S. 963, 104 S.Ct. 2181, 80 L.Ed.2d 562 (1984); 1 Steven F. Friedell, *Benedict on Admiralty* § 185 (7th ed.2000).

12. In addition to short-term storage incident to discharge and stevedoring, there may also be short-term storage incident to customs inspection. Where such temporary storage is incidentally necessary to the proper verification of goods entering a country from sources abroad, presumably admiralty jurisdiction would equally apply.

completed; nor is there any indication that Brazilian customs had any further need to retain the goods for their own inspection purposes. Most telling of all, Brocsonic desired that the storage of its goods at Santos be indefinite, thus revealing its desire for long-term storage services. *See Orient Atlantic Parco, Inc. v. Maersk Lines*, 740 F.Supp. 1002, 1006 ("While short-term storage between discharge and delivery may be sufficiently related to maritime services to fall within the court's admiralty jurisdiction, storage for an indefinite period of time while the parties resolve various contract disputes is not sufficiently related to maritime activity to invoke federal admiralty jurisdiction.") (citation omitted).

■ Because we readily conclude that the land-based storage of Brocsonic's cargo was not incidental to the underlying bills of lading, and because Brocsonic sues based on events occurring out of that land-based storage, the mixed contract doctrine requires that we find a lack of federal admiralty jurisdiction over Brocsonic's action. *See Pillsbury Flour Mills Co. v. Interlake S.S. Co.*, 40 F.2d 439, 440 ("If ... the storage were a mere incident to the transportation, the entire contract would be held to be maritime, and within the admiralty jurisdiction. But here the contract for holding the corn in storage did not concern navigation. It ... had no relation to further transportation of the cargo by the vessel.... It was merely a contract for winter storage, and was no more maritime in its nature than the non-maritime contracts for winter wharfage.").

### 3. *Constructive Delivery*

The passage of substantial time between discharge and actual delivery is another factor that necessarily affects the existence of federal admiralty jurisdiction over a maritime contract. As Judge Friendly observed:

> If a shipper is dilatory in calling for his goods [after discharge], the relationship between the carrier and the shipper would no longer be governed by the contract of carriage. In such event, it seems likely that any dispute between the parties would no longer be within the admiralty jurisdiction, their relative rights and duties becoming a matter for the common law.

*Leather's Best, Inc. v. S.S. Mormaclynx*, 451 F.2d 800, 807 n. 5 (2d Cir.1971).[13] As discussed *supra*, the guiding touchstone of admiralty jurisdiction is maritime commerce, i.e., the marine transport of cargo. Once such carriage has been completed, the federal interest over the cargo wanes–not instantaneously, but certainly as soon as the cargo loses its dynamic connection to global maritime trade. Our task is to determine when the relationship between Brocsonic and Maersk shifted from that of shipper-carrier to that of consignee-warehouseman. To do so, we turn to the doctrine of constructive delivery.

■ Constructive delivery principles are ordinarily used to determine when a carrier's duty to effect proper delivery ends under the Carriage of Goods by Sea Act, 46 U.S.C.App. § 13000 et seq., and the Harter Act, 46 U.S.C.App. § 190 et seq. In that particular context, constructive delivery has been defined to occur when: (1) the subject cargo has been discharged to a fit and customary wharf; (2) the cargo is available for retrieval; (3) the consignee has been notified that his cargo is available; and (4) a reasonable period of time for retrieval has elapsed. *See United States v. Afram Lines*, 1995 WL 224616 at *10 (S.D.N.Y. April 14, 1995); *Orient Atlantic*, 740 F.Supp. at 1005; *see also Calcot, Ltd. v. Isbrandtsen Co.*, 318 F.2d 669, 673 (1st Cir.1963); *Ace Bag & Burlap Co.*

---

**13.** We do not find, as did the court in *Morse Electro Prods. Corp. v. S.S. Great Peace*, 437 F.Supp. 474, 481 (D.N.J.1977), that footnote five of *Leather's Best* applies only to circumstances involving theft, but not misdelivery. The existence of admiralty jurisdiction over a contract does not turn on the manner of breach, but rather on the contractual service being provided and its relationship to maritime commerce.

v. *Sea–Land Serv. Inc.,* 40 F.Supp.2d 233, 237 (D.N.J.1999); 2 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 10–17 (2d ed.1994). Courts have looked to constructive delivery as an indicator of when the basis of a carrier's liability should change from its original role as ocean carrier to that of land-based bailee. *See Philipp Bros. Metal Corp. v. S.S. Rio Iguazu,* 658 F.2d 30 (2d Cir.1981); *Insurance Co. of North Am. v. S/S Italica,* 567 F.Supp. 59, 62 (S.D.N.Y.1983). Certainly, harm that befalls a plaintiff's goods post-constructive delivery may still lead to a finding of liability against the defendant carrier, but only upon some land-based obligation.

The analysis used to determine a carrier's liability as a bailee also sheds light on the question of continued admiralty jurisdiction. Subsequent to constructive delivery, maritime transport will no longer be the core factor driving the contractual relationship. In effect, the underlying maritime purpose of the contract of carriage will have been achieved and the parties will have switched to a more land-based focus–i.e., storage of the cargo pending retrieval. Admiralty jurisdiction is thus no longer present, although a carrier's liability for harm to the cargo may persist beyond constructive delivery. In short, constructive delivery is an appropriate test for when the touchstone of federal admiralty jurisdiction–dynamic maritime commerce–has waned.

In the instant case, there is no real question that Maersk constructively delivered Brocsonic's goods at some point prior to April 1997, the date unauthorized third parties removed Brocsonic's cargo from storage. First, the parties do not dispute that the subject cargo had been discharged in late October 1995 at Santos, a port that Brocsonic has never alleged to be unfit or uncustomary. *See* Xavier Decl. (June 14, 2000) Ex. B; Maersk's Renewed Rule 56 .1 Statement ¶ 5. Second, there is no indica-

tion that Brocsonic's cargo was ever unavailable for retrieval, even while it was being stored inside the Dock Company's facilities.[14] Third, Brocsonic was on actual notice that its cargo could be retrieved. *See* Xavier Decl. (June 14, 2000) ¶ 21; Broker Dep. (Nov. 11, 1999) Tr. at 105. And fourth, 18 months is certainly a reasonable period of time within which cargo retrieval could have been accomplished, especially given repeated requests by Maersk to do so. *See* Broker Dep. (Nov. 11, 1999) Tr. at 114–116.

The Court therefore concludes that constructive delivery of Brocsonic's cargo occurred at some point prior to the April 1997 disappearance of the containers. At that time, Maersk's role as a maritime carrier had ended, and its role as an inland warehouser of cargo had begun. Since a land-based suit against a warehouser is not sufficient to establish federal admiralty jurisdiction, we must grant Maersk's motion to dismiss for lack of subject matter jurisdiction and dismiss Brocsonic's Complaint. We hasten to add that our decision does nothing to insulate Maersk from possible liability for its role in releasing Brocsonic's cargo to unauthorized third parties. We only hold that Brocsonic cannot pursue its land-based claims against Maersk before this federal court sitting in admiralty.

### III. CONCLUSION

For all of the foregoing reasons, we grant Maersk's renewed motion to dismiss for lack of subject matter jurisdiction and dismiss Brocsonic's Complaint.

SO ORDERED.

---

**14.** In fact, there is some evidence that the Dock Company made repeated demands that

Brocsonic remove its cargo from storage. *See* Xavier Decl. (June 14, 2000) ¶ 31.